IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| | ) | **Redacted- Public Version** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-1059-CFC-CJB |
| | ) | |
| IMPERIUM IP HOLDINGS (CAYMAN), | ) | ██████████████ |
| LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF SAMSUNG ELECTRONICS CO., LTD.'S CONCISE STATEMENT OF FACTS FOR PARTIAL SUMMARY JUDGMENT

OF COUNSEL:
Jesse J. Jenner
Steven Pepe
Kevin J. Post
Alexander E. Middleton
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Samuel L. Brenner
Scott S. Taylor
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Douglas H. Hallward-Driemeier
Jonathan R. Ference-Burke
Kathryn C. Thornton
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 2006-6807
(202) 508-4600

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*
*Samsung Electronics Co., Ltd.*

Dated:  March 8, 2021

# **<u>TABLE OF CONTENTS</u>**

Index to Appendix of Exhibits ................................................................... ii

A.    The Imperium-Sony Settlement .......................................................1

B.    Imperium's Assertion of the '029 Patent Against Samsung ...........2

    1.    The Accused Products ............................................................3

    2.    Imperium's Allegations Regarding Claims 14 and 16 .........4

    3.    Imperium's Allegations Regarding Claims 1 and 6 .............6

C.    Damages ...........................................................................................8

\*    All emphasis added unless otherwise indicated.

## INDEX TO APPENDIX OF EXHIBITS

| Exhibit No. | DESCRIPTION | APPENDIX RANGE |
|:---:|---|:---:|
| | Declaration of Kathryn C. Thornton in Support of Samsung's Motion for Partial Summary Judgment | |
| 1. | Excerpts from Complaint, *Imperium IP Holdings, Inc. v. Apple, Sony, et al.*, D.I. 1, No. 11-cv-163 (E.D. Tex. Mar. 30, 2011) | A001-A004 |
| 2. | Settlement and License Agreement between Imperium and Sony Mobile and Sony Corporation, May 2013 | A005-A026 |
| 3. | Excerpts from January 29, 2021 Hearing Transcript, *Samsung Elecs. Co, Ltd. v. Imperium IP Holdings (Cayman), Ltd.*, No. 15-1059-CFC-CJB | A027-A034 |
| 4. | Excerpts from Imperium's Objections and Responses to Samsung's RFAs (February 1, 2021) | A035-A040 |
| 5. | Excerpts from Complaint, *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, No. 4:14-cv-00371 (E.D. Tex. Sept. 6, 2014) | A041-A047 |
| 6. | U.S. Patent No. 7,092,029 | A048-A068 |
| 7. | Imperium Infringement Contentions, PR 3-1 and 3-2 Disclosures (Jan. 26, 2015) | A069-A073 |
| 8. | Excerpts from Expert Report of Cameron HG Wright ("Wright Report") (Sept. 9, 2015) | A074-A116 |
| 9. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 1[a] for Sony-Only Digital Cameras | A117-A173 |
| 10. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 1[a] for Sony-Only Smartphones | A174-A188 |
| 11. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 1[c] for Sony-Only Digital Cameras | A189-A274 |
| 12. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 1[c] for Sony-Only Smartphones | A275-A288 |
| 13. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[a] and Sony-Only Digital Cameras | A289-A333 |

| 14. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[a] for Sony-Only Smartphones | A334-A342 |
|---|---|---|
| 15. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[b] for Sony-Only Digital Cameras | A343-A399 |
| 16. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[b] for Sony-Only Smartphones | A400-A414 |
| 17. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[c] for Sony-Only Digital Cameras | A415-A745 |
| 18. | Compilation of Wright Report Exhibits Concerning '029 Patent, Claim Element 14[c] for Sony-Only Smartphones | A746-A789 |
| 19. | September 24, 2015 Letter from Samsung to Imperium (SAM-1059_000053399) | A790-A792 |
| 20. | September 28, 2015 Letter from Imperium to Samsung (SAM-1059_000053401) | A793-A796 |
| 21. | Notice of Asserted Claims, *Imperium v. Samsung*, No. 14cv371 (E.D. Tex. Nov 25, 2015) | A798-A801 |
| 22. | Samsung's July 20, 2015 Responses and Supplemental Responses and Objections to Imperium's First and Second Set of Interrogatories, Attachment A (7-20-15) | A802-A812 |
| 23. | Excerpts from Deposition Transcript of Cameron H.G. Wright (Oct. 22, 2015) | A813-A826 |
| 24. | Excerpt from User Manual, Galaxy Note 2 (SAM-371_00044608) | A827-A832 |
| 25. | Excerpt from User Manual, Galaxy Note 3 (SAM-371_00044744) | A833-A838 |
| 26. | Excerpt from User Manual, Galaxy Note 4 (SAM-371_00044901) | A839-A845 |
| 27. | Excerpt from User Manual, Galaxy Note Edge (SAM-371_00045028) | A846-A852 |
| 28. | Excerpt from User Manual, Galaxy S5 (SAM-371_00046662) | A853-A861 |
| 29. | Excerpts from Expert Report of Kenneth Parulski Regarding Sony Image Sensors in Samsung Products (Dec. 18, 2020) | A862-A881 |

| **30.** | Excerpts from the Transcript of Trial, *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, No. 4:14-cv-00371, February 2, 2016 (Direct Examination of Wright Concerning '029 Patent) | A882-A891 |
|---|---|---|
| **31.** | Excerpts from Expert Report of J. David Cabello Regarding The Sony License Agreement and Damages (Dec. 18, 2020) | A892-A909 |
| **32.** | Excerpts from the Errata to Expert Report of J. David Cabello Regarding The Sony License Agreement and Damages (Feb. 8, 2021) | A910-A915 |

A.   **The Imperium-Sony Settlement**

1.   In 2011, Imperium sued Sony Ericsson Mobile Communications (USA) Inc. in the Eastern District of Texas, claiming patent infringement.  A002-03.[1]

2.   In May 2013, Imperium and Sony Mobile (and its parent, Sony Corporation) settled that litigation by executing the Settlement and License Agreement ("SLA").  A006.

3.   Pursuant to the SLA, Sony Mobile paid Imperium ██████, while Sony Corporation paid an additional ███████ to obtain a license, release and covenants relating to Imperium's patents.  A010 (§ 3.1).

4.   On January 29, 2021, this Court held that "Samsung is a third-party beneficiary of the SLA."  A030 (58:7-8).

5.   In the SLA:

   a.   "Licensor" means Imperium.  A007.

   b.   "Licensed Products" include Sony image sensors.  A007.

   c.   "Licensed Patents" include U.S. Patent No. 7,092,029 (the "'029 patent").  A007, A020-22.

   d.   The "License" provision recites in part: "Licensee Third Parties are licensed under [the SLA] if and only to the extent they … use … Licensed Products … with respect to such Licensed Products."  A008 (§ 2.1).

---

[1] Exhibits supporting Samsung's Motion for Partial Summary Judgement are compiled in the attached appendix (cited as "A[number]").

e.    The "Covenant Not to Assert or Enjoin" of Section 2.6 recites in part:

> Licensor, on behalf of itself, and its successors and assigns, further covenants not to rely on any Licensed Product or the exploitation thereof (in whole or in part) to satisfy any element of any claim of the Licensed Patents.

A009 (§ 2.6).

## B.    Imperium's Assertion of the '029 Patent Against Samsung

6.    On June 9, 2014, Imperium sued Samsung in the Eastern District of Texas ("Texas Action"), alleging infringement of the '029 patent and two other patents. A042-46.

7.    The Expert Report of Cameron H.G. Wright Concerning Infringement By Samsung ("Wright Rpt.") includes Dr. Wright's infringement opinions that various Samsung products infringe claims 1, 6, 7, 14, and 16 of the '029 patent. A075-76, A078-115. Imperium relied on these opinions in the litigation, including at trial. A884-885 (84:23-85:17); *see generally* A886-891.

8.    In a September 24, 2015 letter, Samsung told Imperium that ████████████████████████████ Imperium was violating the SLA and requested that Imperium ████████████████████████████ ████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████  A791-92.

9.    In a September 28, 2015 letter, Imperium told Samsung that it ███

████████████████████████████████████████████████████████

A794-95.

10.    On November 25, 2015, less than three months prior to trial, Imperium filed a Notice of Asserted Claims and Accused Products to "narrow [the] case for trial."  A799-800.  With that notice, Imperium dropped claims 14 and 16 of the '029 patent.  *See id.*

### 1.    The Accused Products

11.    In his infringement report, Imperium's Dr. Wright accused 75 digital cameras and 18 smartphones of infringing the '029 patent.  A078-083.

12.    As shown in Attachment A to Samsung's interrogatory responses in the Texas Action ("Attachment A"), these 75 accused digital cameras each contain one image sensor.  A808-812; *see also* A080-82; A822-23 (261:25-262:7).  In 41 of these digital cameras, the image sensor is a Sony image sensor.  A808-812 (highlighting in yellow accused digital cameras with a Sony image sensor); *see also* A865-870.

13.    The 18 accused smartphones contain two image sensors: one for the "Main Camera" (i.e., rear camera) and one for the "VT Camera" (i.e., front camera).  A808-09 (Attachment A); *see also* A079; A822-23 (261:25-262:7).

14.    Imperium's Dr. Wright admitted that if a camera does not have a supplemental lighting source (e.g., a flash), it cannot infringe the '029 patent and was not accused of infringing that patent.  A819 (248:21-249:14).

15.    Only the main (rear) cameras in the 18 accused smartphones have a flash.  *See, e.g.*, A832 (Galaxy Note 2 User Manual); A838 (Galaxy Note 3 User Manual); A844-45 (Galaxy Note 4 User Manual), A851-52 (Galaxy Note Edge User Manual); A858-61 (Galaxy S5 User Manual); *see also* A819 (248:9-249:14). Of these 18 smartphones, 5 contain only a Sony image sensor for the main camera. A808-09 (Attachment A) (highlighting in blue accused smartphones with a Sony image sensor in the main camera); *see also* Appx865-870.  Imperium accused only the main cameras of these smartphones, each of which has a flash, of infringing the '029 patent.  A178-188; A404-414; *see also* A819-20 (247:22-248:2, 249:9-250:9).

### 2.    Imperium's Allegations Regarding Claims 14 and 16

16.    Imperium's Dr. Wright opined that the 41 digital cameras with only Sony sensors and 5 smartphones with Sony sensors in the main camera (collectively, "Sony-Only products") infringe claims 14 and 16 of the '029 patent.

A078-082, A105-115 (Wright Rpt.); *see also* A289-A789 (Wright Rpt. Exs., claim 14).

17.     Claim 14 (and dependent claim 16) recites "[a] digital imaging system" (element 14[a]) with "a processor electrically connected to a strobe" (element 14[b]) and with "*an image sensor* coupled to a memory, where a supplemental strobe duration stored in the memory is generated from a preparatory image received at the processor from *the image sensor* when the strobe is activated to generate a preparatory light for a predetermined preparatory duration …." (element 14[c]).  A066 (14:1-12, 14:20).

18.     Imperium's Dr. Wright opined for element 14[b] that each Sony-Only product is equipped with a flash and thus "contains a strobe."  A347-414 (Wright Rpt. Exs., element 14[b]).  The Sony-Only smartphones include two cameras.  Dr. Wright relied on materials that disclose a flash (i.e., a strobe) associated with the main camera (i.e., the camera with a Sony sensor) of the smartphone.  A404-414 (Wright Rpt. Exs., element 14[b]).

19.     Imperium's Dr. Wright admitted that practice of claim 14 "requires an image sensor."  A821 (256:24-257:6); *see also* A825 (273:6-11).

20.     Imperium's infringement proof for the "image sensor" of element 14[c] relied on the image sensors incorporated in the Sony-Only products.  A419-789 (Wright Rpt. Exs., element 14[c]).

21.    Imperium's proof that each Sony-Only product accused of infringing claims 14 and 16 of the '029 patent contains an image sensor relied on Attachment A.  A293-342 (Wright Rpt. Exs., element 14[a]) (citing Attachment A); *see also* A419-789 (Wright Rpt. Exs., element 14[c]) ("As shown under element 14[a] above ….").

22.    Attachment A identifies only a Sony image sensor for the 41 digital camera Sony-Only products.  A808-812 (yellow highlighting).

23.    For the 5 smartphone Sony-Only products, Imperium's proof relied on the image sensor incorporated in the main camera.  A404-414 (Wright Rpt. Exs., element 14[b]); *see also supra* ¶ 18; A819 (Wright Dep. Tr. at 248:21-249:14). Attachment A identifies only a Sony image sensor for the main camera of these smartphone Sony-Only products.  A808-09 (blue highlighting).

### 3.    Imperium's Allegations Regarding Claims 1 and 6

24.    Imperium's Dr. Wright opined that the Sony-Only products infringe claims 1 and 6 of the '029 patent.  A078-101 (Wright Rpt.); *see also* A117-288 (Wright Rpt. Exs., claim 1).

25.    Claim 1 (and dependent claim 6) recites "[a] method of adjusting image lighting" (element 1[a]) and requires "generating a preparatory light …" (element 1[b]) and "*capturing a preparatory image* while generating the preparatory light…." (element 1[c]).  A065 (11:40-57).

26.     The '029 patent discloses that an image sensor captures (i.e., acquires) the preparatory image:  "an image sensor acquires a preparatory image." A049 ('029 patent, Abstract).

27.     Samsung's expert, Kenneth Parulski, opined that it is impossible to capture a preparatory image without using an image sensor.  A878 (¶¶ 131-32).

28.     Imperium's Dr. Wright admitted that for a product to practice claim 1, "you would need some sort of digital imaging sensor" and confirmed that if a product does not have an image sensor, it cannot infringe the '029 patent.  A821 (256:17-257:6); A823 (264:25-265:12).

29.     For each Sony-Only product, Imperium's Dr. Wright opined for element 1[a] that the product is equipped with a flash.  A121-188 (Wright Rpt. Exs., claim element 1[a]).  For the 5 smartphones, Dr. Wright cited to materials that disclose a flash associated with the main (rear) camera (i.e., the camera that uses a Sony sensor) of the smartphone.  A178-188.

30.     For each Sony-Only product, Imperium's Dr. Wright opined for element 1[c] ("capturing a preparatory image") that █████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████  A193-288 (Wright Rpt. Exs., claim element 1[c]).

31.     For the digital cameras, Attachment A identifies the product as incorporating only a Sony image sensor.  A808-812 (yellow highlighting).  For the smartphones, Attachment A identifies the product as incorporating only a Sony image sensor for the main (i.e., rear, with a flash) camera.  A808-809 (blue highlighting).

### C.     Damages

32.     Samsung incurred litigation fees and costs in this action relating to its breach claims and in the Texas Action relating to the SLA and in defending Sony-only products as to the '029 patent. A898-99 (¶¶ 84-85); A902-07 (¶¶ 193-199, 210-214).

/s/ John W. Shaw

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
OF COUNSEL:                          SHAW KELLER LLP
Jesse J. Jenner                      I.M. Pei Building
Steven Pepe                          1105 North Market Street, 12th Floor
Kevin J. Post                        Wilmington, DE 19801
Alexander E. Middleton               (302) 298-0700
ROPES & GRAY LLP                     jshaw@shawkeller.com
1211 Avenue of the Americas          arussell@shawkeller.com
New York, NY 10036
(212) 596-9000

                                     Attorneys for Plaintiff Samsung
Samuel L. Brenner                    Electronics Co., Ltd.
Scott S. Taylor
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Douglas H. Hallward-Driemeier
Jonathan R. Ference-Burke
Kathryn C. Thornton
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 2006-6807
(202) 508-4600

Dated:  March 8, 2021

## <u>CERTIFICATION OF COMPLIANCE WITH TYPEFACE<br>REQUIREMENT AND TYPE-VOLUME LIMITATION</u>

I hereby certify that the foregoing Concise Statement of Fact complies with the word count limitations of this Court's standing scheduling order because this document contains 1,499 words. This brief complies with the type and font limitations of this Court's standing scheduling order because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

OF COUNSEL:
Jesse J. Jenner
Steven Pepe
Kevin J. Post
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Samuel L. Brenner
Scott S. Taylor
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Douglas H. Hallward-Driemeier
Jonathan R. Ference-Burke
Kathryn C. Thornton
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 2006-6807
(202) 508-4600

*/s/ John W. Shaw*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff Samsung*
*Electronics Co., Ltd.*

10

# <u>CERTIFICATE OF SERVICE</u>

I, John W. Shaw, hereby certify that on March 8, 2021, this document was

served on the person listed below in the manner indicated:

## <u>BY EMAIL</u>

Joelle E. Polesky
STRADLEY RONON STEVENS
& YOUNG, LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
(302) 295-3805
jpolesky@stradley.com

Gregory L. Ewing
POTOMAC LAW GROUP, PLLC
1300 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 204-3005
gewing@potomaclaw.com


_/s/ John W. Shaw_
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
_Attorneys for Plaintiff Samsung_
_Electronics Co., Ltd._

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-1059-CFC |
| | ) | |
| IMPERIUM IP HOLDINGS (CAYMAN), LTD., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF KATHRYN C. THORNTON IN SUPPORT OF
SAMSUNG'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Kathryn C. Thornton, herby declare:

1.      I am an associate at the law firm of Ropes & Gray LLP ("Ropes & Gray") and counsel for Plaintiff Samsung Electronics, Co., Ltd. ("Samsung") in the above-captioned matter.  I am over the age of 18 and make this declaration based on my personal knowledge.

2.      Attached as **Exhibit 1** is a true and correct copy of excerpted portions of the Complaint in *Imperium (IP) Holdings, Inc. v. Apple et al.*, Case No. 11-cv-163, filed in the Eastern District of Texas on March 30, 2011.  Highlighting has been added for the convenience of the Court.

3.      Attached as **Exhibit 2** is a true and correct copy of the "Settlement and License Agreement" between Imperium and Sony Mobile Communications

(USA) Inc. (*formerly known as* Sony Ericsson Mobile Communications (USA) Inc.) and Sony Corporation, executed May 2013, and produced by Imperium bearing production numbers IIPH_SAM00364017–IIPH_SAM00364037. Highlighting has been added for the convenience of the Court.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpted portions of the transcript of this Court's January 29, 2021 hearing concerning Imperium's motion to transfer and Samsung's motion for preliminary injunction.  Highlighting has been added for the convenience of the Court.

5.      Attached as **Exhibit 4** is a true and correct copy of excerpted portions of Defendant Imperium IP Holdings (Cayman), Ltd.'s Answers and Objections to First Set of Requests for Admission, dated February 1, 2021.  Highlighting has been added for the convenience of the Court.

6.      Attached as **Exhibit 5** is a true and correct copy of excerpted portions of the Complaint in *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd. et al.*, Case No. 14-cv-371, filed in the Eastern District of Texas on June 9, 2014 (the "Texas Action").  Highlighting has been added for the convenience of the Court.

7.      Attached as **Exhibit 6** is a true and correct copy of U.S. Patent No. 7,092,029 ("the '029 patent").  Highlighting has been added for the convenience of the Court.

8.      Attached as **Exhibit 7** is a true and correct copy of Imperium's Patent Rule 3-1 and 3-2 Disclosures in the Texas Action, dated January 26, 2015. Highlighting has been added for the convenience of the Court.

9.      Attached as **Exhibit 8** is a true and correct copy of excerpted portions of the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung," dated September 9, 2015, from the Texas Action.  Highlighting has been added for the convenience of the Court.

10.      Attached as **Exhibit 9** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 1[a], by Samsung's accused digital cameras containing a Sony image sensor, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

11.      Attached as **Exhibit 10** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 1[a], by Samsung's accused smartphones containing a Sony image sensor in the Main Camera, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

12.     Attached as **Exhibit 11** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 1[c], by Samsung's accused digital cameras containing a Sony image sensor, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

13.     Attached as **Exhibit 12** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 1[c], by Samsung's accused smartphones containing a Sony image sensor in the Main Camera, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

14.     Attached as **Exhibit 13** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 14[a], by Samsung's accused digital cameras containing a Sony image sensor, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

15.     Attached as **Exhibit 14** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029

patent, claim element 14[a], by Samsung's accused smartphones containing a Sony image sensor in the Main Camera, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

16.    Attached as **Exhibit 15** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 14[b], by Samsung's accused digital cameras containing a Sony image sensor, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

17.    Attached as **Exhibit 16** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 14[b], by Samsung's accused smartphones containing a Sony image sensor in the Main Camera, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

18.    Attached as **Exhibit 17** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 14[c], by Samsung's accused digital cameras containing a Sony image sensor, attached to the "Expert Report of Cameron H.G. Wright

Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

19.     Attached as **Exhibit 18** is a true and correct copy of compiled excerpted portions of the claim chart exhibits concerning infringement of the '029 patent, claim element 14[c], by Samsung's accused smartphones containing a Sony image sensor in the Main Camera, attached to the "Expert Report of Cameron H.G. Wright Concerning Infringement by Samsung."  Highlighting has been added for the convenience of the Court.

20.     Attached as **Exhibit 19** is a true and correct copy of a letter from counsel for Samsung, Samuel L. Brenner, to counsel for Imperium, Silvia Jordan, on September 24, 2015, produced by Samsung bearing production numbers SAM-1059_000053399 to SAM-1059_000053400.  Highlighting has been added for the convenience of the Court.

21.     Attached as **Exhibit 20** is a true and correct copy of a letter from counsel for Imperium, R. William Sigler, to counsel for Samsung, Samuel L. Brenner, on September 28, 2015, produced by Samsung bearing production numbers SAM-1059_000053401 to SAM-1059_000053403.  Highlighting has been added for the convenience of the Court.

22.     Attached as **Exhibit 21** is a true and correct copy of Imperium's Notice of Asserted Claims and Accused Products, filed on November 25, 2015.

(Texas Action D.I. 170).  Highlighting has been added for the convenience of the Court.

23.     Attached as **Exhibit 22** is a true and correct copy of excerpted portions of Samsung's July 20, 2015 Responses and Supplemental Responses and Objections to Imperium's First and Second Set of Interrogatories (Nos. 1-17) in the Texas Action, including Attachment A (7-20-15).  Highlighting has been added for the convenience of the Court.  Yellow highlighting in Attachment A identifies Samsung's accused digital cameras containing only a Sony image sensor and blue highlighting identifies Samsung's accused smartphones containing only a Sony image sensor in the Main Camera.

24.     Attached as **Exhibit 23** is a true and correct copy of excerpted portions of the transcript of the October 22, 2015 deposition of Cameron H.G. Wright in the Texas Action.  Highlighting has been added for the convenience of the Court.

25.     Attached as **Exhibit 24** is a true and correct copy of excerpted portions of the User Manual for the Galaxy Note 2, produced by Samsung bearing production numbers SAM-371_00044608 to SAM-371_00044743.  Highlighting has been added for the convenience of the Court.

26.     Attached as **Exhibit 25** is a true and correct copy of excerpted portions of the User Manual for the Galaxy Note 3, produced by Samsung bearing

production numbers SAM-371_00044744 to SAM-371_00044900.  Highlighting

has been added for the convenience of the Court.

27.     Attached as **Exhibit 26** is a true and correct copy of excerpted

portions of the User Manual for the Galaxy Note 4, produced by Samsung bearing

production numbers SAM-371_00044901 to SAM-371_00045027.  Highlighting

has been added for the convenience of the Court.

28.     Attached as **Exhibit 27** is a true and correct copy of excerpted

portions of the User Manual for the Galaxy Note Edge, produced by Samsung

bearing production numbers SAM-371_00045028 to SAM-371_00045161.

Highlighting has been added for the convenience of the Court.

29.     Attached as **Exhibit 28** is a true and correct copy of excerpted

portions of the User Manual for the Galaxy S5, produced by Samsung bearing

production numbers SAM-371_00046662 to SAM-371_00046861.  Highlighting

has been added for the convenience of the Court.

30.     Attached as **Exhibit 29** is a true and correct copy of excerpted

portions of the "Expert Report of Kenneth Parulski Regarding Sony Image Sensors

in Samsung Products," dated December 18, 2020.  Highlighting has been added for

the convenience of the Court.

31.     Attached as **Exhibit 30** is a true and correct copy of excerpted

portions of the transcript of trial testimony in the Texas Action, specifically

portions of the direct examination of Cameron H.G. Wright from the morning and afternoon sessions on February 2, 2016. Highlighting has been added for the convenience of the Court.

32. Attached as **Exhibit 31** is a true and correct copy of excerpted portions of the "Expert Report of J. David Cabello Regarding the Sony License Agreement and Damages," dated December 18, 2020. Highlighting has been added for the convenience of the Court.

33. Attached as **Exhibit 32** is a true and correct copy of excerpted portions of the "Errata to Expert Report of J. David Cabello Regarding the Sony License Agreement and Damages," dated February 8, 2020 [sic].

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 8, 2021

/s/ _Kathryn C. Thornton_

Kathryn C. Thornton

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **IMPERIUM (IP) HOLDINGS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. _____** |
| **APPLE INC.,** | **JURY TRIAL DEMANDED** |
| **KYOCERA COMMUNICATIONS, INC.,** | |
| **LG ELECTRONICS U.S.A., INC.,** | |
| **LG ELECTRONICS MOBILECOMM** | |
| **U.S.A., INC.,** | |
| **MOTOROLA MOBILITY HOLDINGS,** | |
| **INC.,** | |
| **NOKIA, INC.,** | |
| **RESEARCH IN MOTION CORPORATION,** | |
| **and** | |
| **SONY ERICSSON MOBILE** | |
| **COMMUNICATIONS (USA), INC.,** | |
| **Defendants.** | |

<u>**COMPLAINT FOR PATENT INFRINGEMENT**</u>

Plaintiff Imperium (IP) Holdings, Inc. files this Complaint for Patent Infringement against Defendants Apple Inc.; Kyocera Communications, Inc.; LG Electronics U.S.A., Inc.; LG Electronics Mobilecomm U.S.A., Inc.; Motorola Mobility Holdings, Inc.; Nokia, Inc.; Research in Motion Corporation; and Sony Ericsson Mobile Communications (USA), Inc. (collectively "the Defendants") and alleges as follows:

**THE PARTIES**

1.      Plaintiff Imperium (IP) Holdings, Inc. ("IIPH") is a Cayman Islands corporation having a place of business at 515 Madison Avenue, New York, NY 10022.

to the Voyager VX10000 cell phone, throughout the United States, including in this judicial district.

63.     Nokia has infringed, and continues to infringe, one or more claims of the '535 Patent in violation of 35 U.S.C. § 271(a) by manufacturing, using, selling, offering for sale, and/or importing cell phones and/or other devices with image sensors, including, but not limited to the Surge 6790 cell phone, throughout the United States, including in this judicial district.

64.     IIPH has been damaged and continues to be damaged by Apple's, LG's, and Nokia's infringement of the '535 Patent.

### PRAYER FOR RELIEF

WHEREFORE, IIPH demands judgment against Defendants, including its affiliates, officers, agents, servants, employees, and all persons in active concert or participation with them, as follows:

A.      An award to IIPH of such damages under 35 U.S.C. § 284 as it shall prove against the Defendants for infringement of the '884 Patent, '651 Patent, '715 Patent, '768 Patent and '535 Patent, together with pre-judgment and post-judgment interest;

B.      A permanent injunction prohibiting Apple, Kyocera, LG, Motorola, Nokia, RIM and Sony Ericsson from further acts of infringement of the '884 Patent, '651 Patent, '715 Patent, '768 Patent and '535 Patent;

C.      An award to IIPH of the costs of this action and its reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

D.      Such other and further relief as this Court may deem just and appropriate.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, IIPH demands a trial by jury.

Respectfully submitted,

Date: March 30, 2011

*/s/ Alan M Fisch*_____
Alan M. Fisch
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC  20005-2327
(202) 682-3500 telephone
(202) 682-3580 facsimile
Email: alan.fisch@kayescholer.com

*Attorney for Imperium (IP) Holdings, Inc.*

# EXHIBIT 2
# Redacted in its Entirety

# EXHIBIT 3

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
     SAMSUNG ELECTRONICS CO.,      :   CIVIL ACTION
 5   LTD.,                         :
                                   :
 6              Plaintiff,         :
                                   :
 7       vs.                       :
                                   :
 8   IMPERIUM IP HOLDINGS          :
     (CAYMAN), LTD.                :
 9                                 :
                Defendant.    :   NO. 15-1059-CFC-CJB
10

11                          - - -

12                          Wilmington, Delaware
                            Friday, January 29, 2021
13                          10:10 o'clock, a.m.
                            ***Telephone conference
14                          - - -

15
     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
16
                            - - -
17
     APPEARANCES:
18

19              SHAW KELLER LLP
                BY:  JOHN W. SHAW, ESQ.
20

21                     -and-

22

23

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

**A028**

2

1  APPEARANCES (Continued):

2

3      ROPES & GRAY LLP
       BY:  DOUGLAS HALLWARD-DRIEMEIER, ESQ.

4          (Washington, D.C.)

5          -and-

6

7      ROPES & GRAY LLP
       BY:  STEEN PEPE, ESQ.

8          (New York, New York)

9      Counsel for Plaintiff

10

11  STRADLEY RONON STEVENS & YOUNG, LLP
       BY:  JOELLE E. POLESKY, ESQ.

12

13         -and-

14  POTOMAC LAW GROUP

15     BY:  GREGORY L. EWING, ESQ.
           (Washington, D.C.)

16

17     Counsel for Defendant

18

19         - - -

20

21

22

23

24

25

---

3

1          P R O C E E D I N G S

2

3          (The following telephone conference was held

4  beginning at 10:10 a.m.)

5

6          THE COURT:  All right.  Good morning.  Counsel,

7  could we begin with introduction of those who are present.

8  We will start with Samsung.

9          MR. SHAW:  Good morning, Your Honor.  This is

10  John Shaw for Samsung.  Joining me from Ropes & Gray are

11  Doug Hallward-Driemeier and Steven Pepe.  Mr. Dreimeier will

12  be making the argument today.

13          And then also joining from Samsung are Daniel

14  Girdwood.  He's vice president of Samsung America and Justin

15  Cho, who is principal legal counsel for Samsung Electronics

16  Company Limited.

17          THE COURT:  All right.  I'm sorry, Mr. Shaw.

18  Who did you say the first person is going to make the

19  argument?

20          MR. SHAW:  Douglas Hallward-Driemeier,

21  D-r-e-i-m-e-i-e-r.

22          THE COURT:  All right.  I didn't see him on the

23  papers.

24          MR. HALLWARD-DRIEMEIER:  Good morning, Your

25  Honor.  Thus Doug Hallward-Driemeier.  My admission pro hac

---

4

1  vice was moved more recently.

2          THE COURT:  Was it granted?

3          MR. HALLWARD-DRIEMEIER:  I believe so.

4          THE COURT:  Okay.  All right.  Thank you.

5          Is Ms. Poelsky on the phone?

6          MS. POELSKY:  Yes, Your Honor.  Good morning.

7  Joelle Poelsky of Stradley Ronon on behalf of Imperium,

8  and appearing is my co-counsel, Gregory Ewing from Potomac

9  Law who has been admitted pro hac vice, and with Your

10  Honor's permission, he will present the argument.  As well,

11  we have Vince Capone, who is general counsel of

12  Pictos/Imperium.

13          THE COURT:  All right.  Great.  Thank you.

14          MS. POELSKY:  Thank you, Your Honor.

15          THE COURT:  I was a little bit late because I

16  got the e-mail from you all at 9:56.  Frankly, I'm not sure

17  it clears things up at least in my brain, but I have not had

18  too much time to digest it.

19          Let's do this.  Let's begin with the transfer

20  motion.

21          MR. EWING:  Thank you, Your Honor.  This is --

22          THE COURT:  Go ahead.

23          MR. EWING:  This is Greg Ewing on behalf of

24  Imperium.

25          THE COURT:  All right.

---

5

1          MR. EWING:  With regard to the transfer motion,

2  we believe the core issue here is whether Samsung is a

3  third-party beneficiary under the simulations agreement.

4          I'm happy to address the arguments as we see

5  them, but if Your Honor has particular guidance or areas

6  you would like to address, I would be happy to start there.

7          THE COURT:  Well, okay.  Let's begin there.

8  What I'm struck with your motion is, and I wonder whether

9  you basically conceded, because other than the two footnotes

10  that reference Jumara in your opening brief, and they

11  literally just reference it, I don't see any discussion of

12  Jumara, and you agree, Jumara is what governs.  Is that

13  correct?

14          MR. EWING:  Your Honor, we would agree that the

15  Reserves case governs in this instance.  That's the standard

16  or Insituform of North America v. Chandler.

17          THE COURT:  Okay.  So, wait.  What case is

18  that?

19          MR. EWING:  It is Insituform of North America

20  Inc. v. Chandler.  It's a Delaware Chancery court case

21  discussing the standards under Delaware law for third-party

22  beneficiary status.

23          THE COURT:  Okay.  So, see, that's where I'm at

24  a loss, and it's somewhat ironic to me.  You're saying that

25  you're not bound by the forum selection clause in the SLA.

---

**A029**

58

1 venue of the Court over these matters, and so that is
2 further reason that Imperium should not be heard to object
3 to this Court's exercise of jurisdiction.
4         THE COURT:  All right.  Okay.  Well, here's how
5 I'm going to rule then on what I will call the second and
6 alternative transfer issue.
7         I agree that Samsung is a third-party
8 beneficiary of the SLA, and when parties have a contract
9 that contains a valid forum selection clause, the calculus
10 of the Jumara factors changes under the Supreme Court's
11 decision in Atlantic Marine.  And in that situation, no
12 weight is given to the plaintiff's choice of forum and the
13 Court does not consider arguments about the parties' private
14 interests.  The practical results of this analysis under
15 Atlantic Marine is that a valid forum selection clause
16 should be given controlling weight in all but the most
17 exceptional cases.
18         Settled law dictates whether a forum selection
19 clause will be enforced, and that is under a Third Circuit's
20 holding in the McGraw-Hill case found at 909 F.3.d. 48, but
21 the scope of a forum selection clause, that is whether the
22 claims and parties involved in the suit are subject to the
23 clause, is governed by state law under McGraw-Hill, and I
24 point you to page 58 of the decision in that regard.
25         Delaware law -- and the parties agree that

59

1 Delaware law governs the contract that is at issue here.
2 And Delaware law allows that a third person who is in effect
3 a stranger to the contract can enforce a contractual promise
4 in its own right and name if the contract has been made for
5 that party's benefit.
6         And I refer you as support for that principle to
7 the CCC Railcar Service, Inc. case decided by the Delaware
8 Supreme Court in 1993, and it can be found at 630 A.2d 629
9 at page 633.
10         If, however, it was not the promisee's intention
11 to confer direct benefits upon a third person, but rather
12 such third party happens to benefit from the performance of
13 the promise either coincidentally or indirectly, then such
14 third-party beneficiary will be held to have no enforceable
15 rights under the contract.
16         And there I would direct you to the decision by
17 the Delaware Chancery Court in 1987 called Insituform
18 against Chandler, found at 534 A.2d 257, and, in particular,
19 at page 269.
20         So really, the issue here is going to focus on
21 whether or not there was an intent for third parties, and,
22 in particular, Samsung, to benefit from the SLA.
23         Now, the SLA contains a forum selection clause,
24 which we've discussed, and it's found at Section 6.5.
25 Before I turn to that though, let's talk about other

60

1 provisions of the contract to determine whether or not we
2 can infer from those provisions whether or not Samsung was
3 an intended third-party beneficiary of the SLA.
4         Under Delaware law, to establish a third-party
5 beneficiary status requires a showing of three things --
6 one, an intent between the contracting parties to benefit
7 the third party through the contract; two, an intent that
8 the benefits serve as a gift or in satisfaction of a
9 pre-existing obligation to the third party; and, three, a
10 showing that benefiting the third party was a material
11 aspect to the parties that agreed to the contract.  And I
12 cite in this regard Reserve Development LLC against
13 Sovereign Savings Bank at 2007 Westlaw, 4054231 at *18, and
14 that's a Delaware Chancery Court decision from 2007.
15         Turning first to the first prong, whether
16 there's an intent to benefit a third party.  To satisfy this
17 element, a plaintiff must demonstrate that the agreement
18 confers an intended benefit to the plaintiff and show that
19 it received a direct as opposed to incidental benefit from
20 the agreement.  And to make this determination, the Court
21 looks to the terms of the contract.
22         I agree with Samsung, that a number of
23 provisions of the SLA confirm that it was Sony's intention
24 to confer direct benefits upon its customers, including
25 Samsung.  And let's start with looking at the consideration

61

1 and what we know from the terms of the contract as to how
2 the contract was entered.
3         For starters, there are three parties to the
4 agreement.  There, of course, is Imperium, now known as
5 Pictos.  It's one party.
6         On the other side of the ledger are two Sony
7 entities.  One is Sony Mobile Communications USA, Inc., and
8 that was the defendant in the Texas case.
9         The other party is Sony Corp., which is, of
10 course, the Japanese holding and main company in Japan, and
11 that is referred to in the SLA as Sony.
12         Now, the recitals establish that the contract
13 was entered after a mediation between Sony Mobile, the
14 defendant, and Imperium, and it was made after the mediator
15 had proposed a settlement of the litigation ████████████
██████ ████████████████ And that's found at appendix page 3 of
17 DI 125.
18         Now, it is then informative to turn to Section 3
19 of the SLA titled Additional Considerations, and, in
20 particular, to Section 3.1, which is title Payment.  And
21 here, the total consideration that the two Sony entities
22 paid is described, and really, it breaks down to
23 consideration in really two payments or two forms.
24         The first is that Sony Mobile as the licensee
25 agreed to pay Imperium a total of ██████████, and so when you

62

1  consider that with respect to the recital at appendix page 3
2  that I read recital, that's referring to effectively, what
3  was paid to settle the litigation.  But, in addition, the
4  second we see under the payment section of 3.1 that Sony --
5  and that, of course, is the Japanese overarching entity, it
6  agreed to pay the licensor a total of ▮▮▮▮▮▮▮▮  And,
7  of course, Sony was not a party to the litigation, and it's
8  clear from this provision and some of the other provisions
9  I'm about to read that this additional amount of
10 consideration, ▮▮▮▮▮▮ was paid for licenses, and not
11 only a license for Sony, but as we will see, licenses for
12 third parties.
13         The next provision of the contract that's
14 relevant to intent is Section 2.1 of the SLA, which is
15 entitled "License."  And for our purposes, what's important
16 is that a sentence in that section reads that Licensee Third
17 Parties -- and that term is a defined term of the contract.
18 It's capitalized, Licensee Third Parties.
19         And Section 2.1 provides that Licensee Third
20 Parties are licensed under the agreement if and only to the
21 extent they do certain things, and one of those things is
22 that they "use licensed products and covered third-party
23 products with respect to such licensed products or covered
24 third-party products."  And licensed products is a defined
25 term in the contract as is covered third-party products.

63

1          And so what this reference that I've just
2  referenced effectively conferred is a license to third
3  parties who use licensed products and covered third products
4  with respect to those products.
5          Now, as I mentioned, licensee third party is a
6  defined term by the SLA and it's defined on page 2 of the
7  SLA, and it means, among other things, "purchasers," and,
8  "customers and end users of any licensed products or covered
9  third-party products, but solely with respect to such
10 licensed product or covered third party product."
11         So clearly, then, the SLA is contemplating and
12 the parties are intending to confer a license on these third
13 parties to the extent they purchase or use either the
14 licensed products or covered third-party products.
15         The next relevant provision is the definition of
16 a covered third party product, and that is also found at
17 page 2 of the SLA.  And covered third party products are
18 defined by the SLA to mean one of two things.
19         First, "Third-party products are services
20 designed and marketed to operate in conjunction with or
21 offer for sale or sold via a licensed product," or, "Two,
22 third-party products or services that when running using,
23 operating within or otherwise benefiting from the
24 functionality of a licensed product is covered by any claim
25 of the licensed patent."

64

1          Licensed product is a defined term in the SLA.
2  It's defined at page 2 and it means "any past, present and
3  future products, product lines, services, devices, systems,
4  components, network, hardware, software, method, process,
5  functionality, feature, technology, instruction or other
6  instrumentality or any combination of the foregoing and
7  other offering of licensee."
8          So basically, it would mean for our purposes any
9  product made by the licensee, and we're talking about any
10 Sony-made product.
11         So when you read all of those definitions
12 together with Section 2.1, it's clear that the parties to
13 the SLA intended to confer a license, albeit a limited
14 license, that would extend to third parties and that would
15 cover those third parties to the extent they used Sony
16 products.
17         In addition, Section 2.2 shows that the parties
18 to the SLA intended to confer benefits on licensees or third
19 parties.  That provision, which I'm not going to read into
20 the record, but it can be found at page 3 of the SLA at
21 Appendix 5 of DI 125, and it confers a broad release on the
22 licensee third parties for using either the licensed
23 products or the covered third-party products.
24         There is in addition Section 2.6 of the SLA,
25 which is a very broad covenant not to assert or enjoin, and

65

1  it provides that, again, reference is made to the covered
2  third-party product and to licensed products and it
3  basically limits or precludes, I should say, Imperium from
4  asserting or making any claim or prosecuting any lawsuit for
5  infringement against any entity for infringement of the
6  licensed patent with respect to licensed products or covered
7  third-party products.
8          Now, what's significant here is that the
9  covenant applies to infringement claims brought against "any
10 entity."  So, again, it's clearly, especially when read in
11 light of the provisions of the SLA that I've just discussed,
12 it's going beyond the signatories to the SLA and it is
13 contemplating there an intent to confer benefits of the SLA
14 on third parties.
15         Now, in addition, there is a section which we
16 discussed in the argument that is titled excluded parties,
17 and it's found at 2.8, and basically, this sentence, or,
18 rather, this provision allowed for the identification of
19 parties that would be excluded from the third-party benefits
20 that are conferred by clauses in the SLA and some of which
21 I've already read into the record.  And it's undisputed that
22 on the list of excluded parties, Samsung was identified.
23 However, there is an exception to excluded parties, which is
24 relevant to the issue before me, and that is found at the
25 last sentence of Section 2.8, and it provides, "Excluded

**A031**

66

1  party shall not however include any licensee third-party
2  with respect to licensed products or covered third-party
3  products regardless of whether or not they are included in
4  Subsections 1 through 3 of this Subsection 2.8."  And let me
5  pause for a second and say that those subsections are
6  referring to the lists or the schedules on which the
7  excluded parties, including Samsung, were identified.
8       So then going back to the text of the last
9  sentence, in a parenthetical is written the following.  "By
10 way of example and not of limitation, an entity which is a
11 purchaser or end user of a Sony imaging sensor is not an
12 excluded party with respect to that Sony imaging sensor."
13      And so what the effect of that last sentence,
14 and, in particular, what's made clear by the parenthetical I
15 just read is that even if an entity such as Samsung were to
16 be listed in one of the schedules that is connected to
17 Section 2.8 of excluded party, those entities, including
18 Samsung, are not deemed to be excluded from third-party
19 beneficiary status to the extent they are a purchaser of a
20 Sony imaging sensor.
21      So here again that language manifests an intent
22 by the parties to confer on third parties, and, in
23 particular, Samsung, beneficiary status and to derive a
24 benefit from the SLA.  And because it's undisputed that
25 Samsung was a purchaser of licensed products, it qualifies

67

1  as a licensee to this party under the definition provided in
2  the contract, and when read with the provisions that I've
3  just discussed, I do think it's clear that the parties to
4  the SLA intended to confer third-party beneficiary status on
5  Samsung.
6       Now, Imperium points to the general disclaimer
7  found at 6.7 of the contract.  And it's true that 6.7
8  provides, or I should say is titled "No further license, no
9  third-party rights," but the key to 6.7 for our purposes is
10 the last clause, which reads, "Except as expressly provided
11 in this agreement."  So, in other words, it's true, there is
12 a general disclaimer, and if there were nothing but the
13 general disclaimer under Delaware law, it would preclude a
14 determination of the existence of third-party beneficiaries,
15 but the disclaimer is followed by the clause "Except as
16 expressly provided in this agreement," and as I just
17 discussed, there are express provisions in the agreement
18 that apply to third parties generally and, more importantly,
19 they apply to Samsung.
20      Imperium cites a long list of -- rather, not a
21 long list, but it cites a list of cases which it says stand
22 for "longstanding law" that uphold disclaimers of
23 third-party rights, but none of those cases I think are
24 apposite here.  Three of the opinions, in particular, the
25 Golvagna case, which is found at 1997 Westlaw, 720463, the

68

1  United Rentals case found at 9307 A.2d 810, and the
2  Community Association Underwriters case, found at 488 Fed.
3  Appx. 547, none of those cases explicitly ruled on
4  disclaimers.
5       The other three cases cited by Imperium cited
6  disclaimers that did not have exceptions such as we have in
7  this case, and those three cases are the Peershellens case,
8  found at 2003 Westlaw 21649926, the E.I. DuPont de Nemours
9  case, found at 269 F3d. 0187, and the Empire Fire and Marine
10 Insurance case, found at 2012 Westlaw 1151031.
11      I should add that even if Section 6.7 had not
12 excepted the additional rights that were expressly provided
13 in the agreement, the clear rights granted to qualifying
14 third parties in Sections 2.1, 2.2, 2.6 and 2.8 would still
15 control.
16      Under Delaware law, it's well settled that rules
17 of contract construction require that a contract be
18 construed as a whole giving effect to the parties'
19 intention, and specific language in a contract controls over
20 general language, and where specific and general provisions
21 conflict, the specific provision ordinarily qualifies the
22 meaning of the general one.  And I point you in this regard
23 to the DCB Holdings case of the Delaware Supreme Court,
24 found at 889 A2d, 954.
25      And so therefore, where as in this case, we have

69

1  a broad provision disclaiming third-party rights, but that
2  conflicts with several specific provisions granting
3  third-party rights, the specific provisions will qualify
4  that broad disclaimer.
5       The case that is most similar perhaps to this
6  case is a Delaware Chancery Court decision titled Amirsaleah
7  against Board of Trade, found at 2008 Westlaw, 4182998.  In
8  that case, an agreement contained a general provision that
9  disclaimed any third-party beneficiaries.  The Court found
10 that the disclaimer was "belied by the agreement's specific
11 grant of benefits to third parties," and that the plaintiff
12 was seeking to enforce "a right that is specifically and
13 explicitly granted in the contract," and thus the party had
14 standing as a third-party beneficiary.  That's what we have
15 in this case.
16      Lastly, Imperium argued that essentially, there
17 has to be an explicit assignment of a third-party
18 beneficiary right in the forum selection clause itself.
19      So, first of all, I don't agree with that as a
20 matter of law, and I refer back to the DCC Holdings case,
21 which requires under Delaware law that the contract be
22 construed as a whole.
23      But, secondly, as I pointed out during the
24 course of the argument, if you look at Section 6.5, which is
25 the forum selection clause itself, it has two clauses that

**A032**

70

1  are relevant, A and B.  And B says that the parties to the
2  SLA, and only the parties to the SLA, agree to "submit any
3  disputes and matters of interpretation and controversies to
4  the Delaware Court, but clause A is broader than that and it
5  is not limited to the submission by the two signatories or
6  the three signatories to the SLA to submit their disputes to
7  Delaware courts.  It's much broader, and it provides that
8  the parties to the SLA agree that "all disputes in
9  litigation regarding the agreement are to be submitted to,
10 or are to be subject to, rather, the exclusive
11 jurisdiction."
12         So I think the fact, if you want to give meaning
13 to both clauses, the only way to do it, and you have to do
14 this under Delaware construction principles, is to
15 understand that the first clause is much broader and it's
16 basically applicable to all entities, which would include
17 third parties, that they have to bring disputes in
18 litigation into a Delaware court, and that would still give
19 meaning to the second clause found in Subsection B that
20 requires both the Sony parties and Imperium specifically to
21 submit their disputes to Delaware courts.
22         So for that reason I find that the first prong
23 of the third-party beneficiary analysis under Delaware law
24 shows that Samsung was an intended third party.
25         Turning then to the second element, which is an

71

1  intent that the benefits serve as a gift or in satisfaction
2  of a pre-existing obligation.  And here, I think the plain
3  language of the SLA shows that Sony negotiated from Imperium
4  a license, a release and a covenant not to assert that
5  covers Sony's customers.
6          Again, I think if you step back and think about
7  it logically, the fact of the consideration is really, it
8  consisted of two payments, if you will, and it's the second
9  payment, which was made by the Sony Corporation from Japan
10 of [redacted], shows that there was more intended by the
11 agreement than simply a settlement of the Texas litigation.
12 And, again, go back and look a Section 2.1, which is
13 extending a license to licensee third party: Section 2.2,
14 which is extending a release to licensee third parties; and
15 then Sections 2.6, which is precluding Imperium from
16 asserting infringement against any entity is all evidence
17 that the benefits of this SLA not only were extended to
18 third parties, but they served as a gift, at the very least.
19 They were not coincidental or incidental.
20         Lastly, there has to be a showing that
21 benefiting a third party was a material aspect of the
22 contract.  Here, I think it's very probative that only
23 [redacted] of the [redacted] in consideration was on account
24 of the settlement of the litigation.  I think that shows
25 materiality.  I think the fact that the contract was clear

72

1  and unambiguous in its conferring of the third-party rights
2  shows again that they were material to the SLA.
3          In short, Samsung has satisfied me that all
4  three elements requiring Delaware law show that a
5  third-party beneficiary exists, and therefore I will apply
6  the modified balancing test under Atlantic Marine to
7  determine whether this is one of the few "most unusual
8  cases" where a forum selection clause does not control.
9          We've already discussed the factors, so I don't
10 really need to go over that.  I do not think that the public
11 interest factors would trump the applicability of a forum
12 selection clause and here it's not a most exceptional case
13 and therefore I'm going to deny the transfer motion on
14 alternative grounds.  Namely that the forum selection clause
15 does apply and Samsung had standing to invoke the clause and
16 the case should reside, or should, rather, should be
17 maintained in this district.  All right.
18         So now we turn to the preliminary injunction
19 motion and I will hear the movant.
20         MR. HALLWARD-DRIEMEIER:  Thank you, Your Honor.
21         I'm going to rely, as our papers do, primarily
22 on the Federal Circuit's General Protect decision, 651 F3d.
23 1355, which also involved an attempt to enforce a forum
24 selection clause against a patentee who was asserting an
25 infringement action in the ITC, and in that case, the

73

1  Federal Circuit affirmed the district court's injunction,
2  ordering the patentee to cease their pursuit of relief
3  before the ITC so that the district court that was the
4  chosen forum could decide the merits of the parties'
5  disagreement about the scope of the license.
6          And Your Honor recited the forum selection
7  clause 6.5, and I think you referenced specifically
8  provision A as applicable to third-party beneficiaries, and
9  it describes all disputes and litigation regarding this
10 agreement, its construction and matters connected with
11 its performance, and that is very similar to the very broad
12 language in the forum selection clause that was at issue
13 in General Protect.  We said any disputes between the
14 parties relating to, arising out of the settlement
15 agreement.
16         So what General Protect says in that instance
17 where there is that broad a forum selection clause is that
18 the party seeking to enforce it does not need to establish
19 in order to invoke the forum selection clause and even in
20 order to obtain a preliminary injunction against litigation
21 in a second forum that the license defense is necessarily
22 going to succeed ultimately on the merits, but rather that
23 there is a nonfrivolous dispute regarding the patent
24 license.
25         And it's that dispute, it's the parties'

102

1   there doing the same thing, utilizing the claimed
2   technology, and they do that on page 156.  They point to
3   their claim charts with respect to Sony image sensors or
4   each of the four asserted patents.  For two of the four
5   asserted patents, the '145 patent and the '671 patent, the
6   only image sensors that Imperium points to that practice the
7   asserted patents are Sony image sensors.
8          THE COURT:  Can you show me where this is again?
9   This is 156.  I don't see that.
10         MR. HALLWARD-DRIEMEIER:  These are Exhibit 36 to
11  39.
12         THE COURT:  Hold, on hold on.  I'm looking at
13  something different.  I'm looking at DI 125 at A156.  What
14  DI number are you?
15         MR. HALLWARD-DRIEMEIER:  I'm looking at the
16  appendix that was submitted.  My copy doesn't have a DI
17  number.  It's appendix in support of Samsung's opening brief
18  and support of motion for preliminary injunction.
19         THE COURT:  Hold on.
20         MR. HALLWARD-DRIEMEIER:  I think it's DI 125.
21         THE COURT:  Yes, I have DI 125 and I have the
22  same title you do, but at A156 -- okay.  I have exhibit
23  numbers and they have a description.  Is that what you are
24  referring to, a list of things here?
25         MR. HALLWARD-DRIEMEIER:  Yes, Your Honor.

103

1          THE COURT:  All right.  I'm sorry.  Okay.  And
2   then you are saying that they are using a representative use
3   chart of a Sony IMAX series.  I see.
4          MR. HALLWARD-DRIEMEIER:  Right.
5          THE COURT:  That is the point.  That would
6   suggest to me that they are asserting an infringement theory
7   based on the existence of a Sony image sensor, but you guys
8   have agreed that they are not.  I mean, that's what I
9   thought coming into this.  I thought basically, I thought
10  I've given you the oral order.  I thought you would work out
11  some kind of agreement and I could even sign a stipulated
12  order that would make it clear that Imperium cannot advance
13  any theory in the ITC of infringement based on the existence
14  of a Sony product in any of the accused products.  That is
15  what is the right result in my mind.
16         I thought orally, it sounds like you have
17  agreed, there is agreement on that.  I would agree with you,
18  that the exhibit list at A156 certainly seemed to suggest
19  that Imperium has maybe taken a different position in the
20  past and if you wanted an injunction somehow to say, look,
21  ==they can't go forward and argue a theory of infringement==
22  ==based on the existence of a Sony image sensor in the==
23  ==product, I think you are right.  You should win on that, not==
24  ==under a covered third-party product definition, but under a==
25  ==licensed product definition, and under the second prong of==

104

1   ==the covenant not to sue in, I believe it's Section 2.6 of==
2   ==the SLA.==
3          But, Imperium, maybe I will ask.  Imperium,
4   you've got this list on A156.  I assume that's going to
5   disappear based on your representations to this Court.
6          MR. EWING:  Your Honor, no.  In the ITC, to show
7   you're a licensee, you have to show a use chart that the
8   licensees actually do use your patents.  So it's part of the
9   domestic industry showing.  It has nothing to do with
10  infringement.
11         THE COURT:  All right.
12         MR. EWING:  I am not seeking infringement based
13  on these charts, and you can see that on page -- paragraph
14  110, which is page A184.
15         THE COURT:  Okay.  And that actually -- yes.  I
16  get that.  I get that now.  So it's not the basis of an
17  infringement at all?
18         MR. EWING:  That is correct, Your Honor.
19         THE COURT:  Okay.
20         MR. EWING:  It's based on domestic industry.
21         THE COURT:  Just to be clear, I did read the
22  complaint, the ITC complaint yesterday and I'm looking at it
23  again and that's absolutely correct.  So, you know, this is
24  an example, Samsung, of, I guess, playing a little fast and
25  loose here.

105

1          MR. HALLWARD-DRIEMEIER:  I'm --
2          THE COURT:  You know --
3          MR. HALLWARD-DRIEMEIER:  My apologies, Your
4   Honor.  I thought I had made clear that these allegations
5   were made with respect to domestic industry.  I said that.
6          THE COURT:  But we've already established that
7   that is not -- I believe in my mind, it's not relevant.
8          MR. HALLWARD-DRIEMEIER:  So --
9          THE COURT:  The prohibition is very clear that
10  Imperium cannot assert a theory of infringement of the
11  patents in the ITC based on the existence of a Sony product
12  in the Samsung accused product.
13         MR. HALLWARD-DRIEMEIER:  And --
14         THE COURT:  And I understand, and somebody needs
15  to correct me if I'm wrong, but I understand from the oral
16  representations made here today that Imperium is not doing
17  that and will not do that and has not done that.
18         Is that correct, Imperium?
19         MR. EWING:  That is correct, Your Honor, and
20  it's on page -- in paragraph 47 of our ITC complaint, and
21  that is on A170.
22         THE COURT:  Right.
23         MR. HALLWARD-DRIEMEIER:  And my point, Your
24  Honor, is a slightly different one, which is that Imperium's
25  claims in the ITC are self-defeating, because in order to

**A034**

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | |
| Plaintiff, | |
| | |
| v. | Civil Action 15-1059-CFC |
| | |
| IMPERIUM IP HOLDINGS (CAYMAN), LTD., | |
| Defendant. | |

**DEFENDANT IMPERIUM IP HOLDINGS (CAYMAN), LTD.'S**
**ANSWERS AND OBJECTIONS TO FIRST SET OF REQUESTS FOR ADMISSION**

Defendant Imperium IP Holdings (Cayman), Ltd ("Imperium") responds and objects as follows to Plaintiff Samsung Electronics Co., Ltd. ("Samsung") First Set of Requests for Admission ("RFAs"):

**GENERAL OBJECTIONS**

1.    Imperium objects to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other recognized privilege.

2.    Imperium objects to the RFAs to the extent they seek information and/or documents neither relevant to the claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

3.    Imperium objects to the RFAs to the extent they are overly broad and/or to the extent that such production would be oppressive, unduly burdensome, unreasonably expensive or would require an unreasonable investigation on the part of Imperium.

4.    Imperium objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those

1

**REQUEST FOR ADMISSION NO. 7.**

 Sony sells Sony image sensors to Samsung.

**RESPONSE**

 Imperium lacks sufficient knowledge to admit or deny the business relationship between Sony and Samsung as related to how Samsung obtains Sony image sensors.

**REQUEST FOR ADMISSION NO. 8.**

 When Imperium and Sony entered into the Sony License Agreement, Sony had been selling Sony image sensors to Samsung.

**RESPONSE**

 Imperium lacks sufficient knowledge to admit or deny the type of business relationship between Sony and Samsung as related to how Samsung obtained Sony image sensors when Imperium and Sony entered into the Sony License Agreement.

**REQUEST FOR ADMISSION NO. 9.**

 When Imperium and Sony entered into the Sony License Agreement, Imperium was aware that Sony had been selling Sony image sensors to Samsung.

**RESPONSE**

 Imperium lacks sufficient knowledge to admit or deny the type of business relationship between Sony and Samsung as related to how Samsung obtained Sony image sensors when Imperium and Sony entered into the Sony License Agreement.

**REQUEST FOR ADMISSION NO. 10.**

 The -371 Asserted Patents are Licensed Imperium Patents.

5

**RESPONSE**

Imperium admits that the -371 Asserted Patents are licensed to Sony under the Sony License Agreement.

**REQUEST FOR ADMISSION NO. 11.**

The -1231 Asserted Patents are Licensed Imperium Patents.

**RESPONSE**

Imperium admits that the -1231 Asserted Patents are licensed to Sony under the Sony License Agreement.

**REQUEST FOR ADMISSION NO. 12.**

Imperium contends that the IMX Series of Sony image sensors identified in the -1231 Investigation practice at least one claim of the Licensed Imperium Patents.

**RESPONSE**

Imperium admits that the IMX Series of Sony image sensors identified in the -1231 Investigation practice at least one claim of the Licensed Imperium Patents.

**REQUEST FOR ADMISSION NO. 13.**

Imperium contended that the ICX Series of Sony image sensors included in some of the -371 Accused Products practice at least one claim of the Licensed Imperium Patents.

**RESPONSE**

Imperium admits that the ICX Series of Sony image sensors practice at least one claim of the Licensed Imperium Patents.

**REQUEST FOR ADMISSION NO. 14.**

Imperium contended that the ISX Series of Sony image sensors included in some of the -

6

**REQUEST FOR ADMISSION NO. 74.**

In the -371 action, Imperium accused Samsung-Sony products of infringing claims 14 and 16 of the '029 patent.

**RESPONSE**

Denied.  *See* January 18, 2016 Notice of Asserted Claims and Accused Products, D.I. 213 in the Texas Action.

**REQUEST FOR ADMISSION NO. 75.**

With respect to Imperium's contention that Samsung infringes claims 14 and 16 of the '029 patent, in his expert report in the -371 action, Dr. Wright relied on Sony image sensors in at least some of the Samsung-Sony products in opining that Samsung products infringed those claims.

**RESPONSE**

Denied.

STRADLEY RONON
STEVENS & YOUNG, LLP

_____*/s/ Joelle E. Polesky*_____
Joelle E. Polesky (ID No. 3694)
1000 North West Street, Suite 1279
Wilmington, DE 19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com

*Attorneys for Defendant,*
*Imperium IP Holdings (Cayman), LTD.*

Dated: February 1, 2021

25

**A039**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>IMPERIUM IP HOLDINGS (CAYMAN), LTD.,<br><br>Defendant. | Civil Action 15-1059-CFC |

## VERIFICATION

I certify that the answers set forth in Defendant Imperium IP Holdings (Cayman), Ltd.'s Answers and Objections to First Set of Requests for Admission are true and correct to the best of my knowledge, information, and belief. I further certify that I am authorized to execute this Verification on behalf of Imperium IP Holdings (Cayman), Ltd.

Dated: February 1, 2021

Vincent S. Capone
General Counsel

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **IMPERIUM IP HOLDINGS (CAYMAN), LTD.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. _____** |
| | **JURY TRIAL DEMANDED** |
| **SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, SAMSUNG SEMICONDUCTOR, INC., SAMSUNG TECHWIN CO., LTD., AND SAMSUNG OPTO-ELECTRONICS AMERICA, INC. (D/B/A SAMSUNG TECHWIN AMERICA),** | |
| **Defendants.** | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Imperium IP Holdings (Cayman), Ltd. ("Imperium") files this Complaint for Patent Infringement against Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, Samsung Semiconductor, Inc., Samsung Techwin Co., Ltd., and Samsung Opto-Electronics America, Inc. (d/b/a Samsung Techwin America) (collectively, "Defendants") and asserts as follows:

## THE PARTIES

1.      Imperium is an intellectual property company that holds more than 70 patents on core technologies relating to image sensors and other features used in consumer electronic products such as cell phones, digital cameras, tablet computers, and laptops.  Years ago, at the request of the United States Government, a team of engineers at Imperium's predecessor-in-interest developed image sensor technologies for use in military applications, and

40.     Imperium has been damaged, and continues to be damaged, by Defendants' infringement of the '290 Patent.

## COUNT THREE
## INFRINGEMENT OF U.S. PATENT NO. 7,092,029

41.     Imperium re-alleges and incorporates by reference paragraphs 1-17 above.

42.     On August 15, 2006, the U.S. Patent and Trademark Office duly and legally issued United States Patent No. 7,092,029 (the "'029 Patent"), entitled "Strobe Lighting System for Digital Images."  Imperium is the owner of the '029 Patent, a true and correct copy of which is attached as Exhibit C to this Complaint.

43.     The '029 Patent relates to inventive systems and methods for determining the amount of supplemental flash lighting needed to properly expose a photographic subject (as used, for example, in digital cameras, cell phones, etc.).  The '029 Patent has claims directed to, *inter alia*, a method of adjusting image lighting, the method comprising: generating a preparatory light for a predetermined preparatory duration; capturing a preparatory image while generating the preparatory light, wherein the preparatory image is represented by preparatory image data; determining an average preparatory image luminance of the preparatory image based on the preparatory image data and weighting at least a subset of the preparatory image data; generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings; and generating a look-up table storing associated image strobe durations and power values including a preparatory image strobe duration and associated preparatory power value.

44.     Defendants have infringed and continue to infringe one or more claims of the '029 Patent, in violation of 35 U.S.C. § 271, by manufacturing, using, selling, offering for sale, and/or importing cell phones, digital cameras, tablet computers including, but not limited to, the following (collectively referred to as the "'029 Accused Devices"): *cell phones* such as the

Intensity II (SCH-U460) and the Galaxy S2 and S3; *tablet computers* such as the Galaxy Tab 7.0 and Tab 7.7 tablets, the Galaxy Tab 10.1 (GT-P7510) and Galaxy Tab 2 10.1 (GT-P51XX); *digital cameras* such as the Digimax S500 and S600, the DV150F, the DV300F, the EX2F, the Galaxy Camera, Galaxy Camera 2, and Galaxy NX Camera, the MV900 and MV900F digital cameras, the NV3, NV4, NV11, NV15, and NV40 digital cameras, the NX-5, NX-20, NX-30, NX-300, NX-1000, and NX-2000 digital cameras, the PL20, PL21, PL90, PL120, and PL121 digital cameras, the S85, S630, S730, S750, S760, S850, and S860 digital cameras, the ST72, ST150F, and ST151F digital cameras, the WB30F, the WB100, the WB150 and WB150F digital cameras, the WB200F, WB250, WB350, WB350F, WB800F, WB850, and WB2100 digital cameras; and any such reasonably similar products.

45.    By way of example, the '029 Accused Devices include a processor electrically connected to a strobe, and an image sensor coupled to a memory, where a supplemental strobe duration stored in the memory is generated from a preparatory image received at the processor from the image sensor when the strobe is activated to generate a preparatory light for a preparatory duration.   The processor of the '029 Accused Devices accesses a look-up table in the memory that stores image strobe durations and power values including a preparatory image strobe duration and an associated preparatory power value.

46.    Defendants also indirectly infringe the '029 Patent by inducing infringement by others, such as manufacturers, resellers, and/or end-users of the '029 Accused Devices, of one or more claims of the '029 Patent in violation of 35 U.S.C. § 271. On information and belief, Defendants knew of the '029 Patent and knew of its infringement, including by way of this lawsuit and earlier.  For example, Defendants knew of the '029 Patent at least as early as March 2013, when the U.S. Patent and Trademark Office identified the '029 Patent for Defendant SEC in an Office Action during prosecution of a Samsung patent application (U.S. Patent Application No. 12/731,244).

47.    Defendants' affirmative acts of selling the '029 Accused Devices, causing the '029 Accused Devices to be manufactured and distributed, and providing instruction manuals for the '029 Accused Devices have induced and continue to induce Defendants' manufacturers, resellers, and/or end-users to make or use the '029 Accused Devices in their normal and customary way to infringe the '029 Patent.  Defendants have specifically intended and were aware that these normal and customary activities would infringe the '029 Patent.  Defendants performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '029 Patent and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.

48.    Defendants further indirectly infringe the '029 Patent by manufacturing, using, selling, offering for sale, and/or importing the '029 Accused Devices to resellers and/or end-users with knowledge that the '029 Accused Devices were and are especially manufactured and/or especially adapted for use in an infringement of the '029 Patent, and are not a staple article or commodity of commerce suitable for substantial non-infringing use.

49.    The '029 Patent recites the invention of a circuit with the function of adjusting image lighting.  Each of the '029 Accused Devices contains a processor and/or image sensor with a circuit that performs this function in the manner claimed in the '029 Patent.  This circuit is integrated into the processor and/or image sensor, which is mounted directly onto a circuit board for use in the device.  On information and belief, individual portions of the processor and/or image sensor are not designed to operate in isolation; they are designed to operate in unison.  Accordingly, without this circuit or its function, the processor and/or image sensor would either not function or function in an unintended manner.  From this, the most compelling inference that arises is the processor and/or image sensor has no substantial non-infringing uses, and that any other uses would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.  Defendants' manufacture, use, sale, offering for sale, and/or importation of the '029 Accused Devices to resellers and/or end-users constitutes contributory infringement of the '029 Patent.

50.     On information and belief, including the allegations above showing knowledge and intent, Defendants' infringement has been and continues to be deliberate, willful, and in reckless disregard of Imperium's patent rights.

51.     Imperium has been damaged and continues to be damaged by Defendants' infringement of the '029 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Imperium demands judgment against Defendants, including their affiliates, officers, agents, servants, employees, and all persons in active concert or participation with them, as follows:

A.     An award to Plaintiff Imperium of such damages under 35 U.S.C. § 284 as proven against Defendants for infringement of the '884 Patent, '290 Patent, and '029 Patent, together with pre-judgment and post-judgment interest;

B.     A permanent injunction prohibiting Defendants from further acts of infringement of the '884 Patent, '290 Patent, and '029 Patent;

C.     A declaration that Defendants have willfully infringed the '884 Patent, '290 Patent, and '029 Patent;

D.     An increase in the award of damages to Plaintiff Imperium up to three times the amount of its actual damages for Defendant's willful infringement, as authorized by 35 U.S.C. § 284;

E.     An award to Plaintiff Imperium of the costs of this action and its reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

F.     Such other and further relief as this Court may deem just and appropriate.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Imperium demands a trial by jury.


Date: June 9, 2014                                    Respectfully submitted,


                                   */s/ Alan M. Fisch*_____
                                   Alan M. Fisch
                                   FISCH SIGLER LLP
                                   5335 Wisconsin Avenue NW
                                   Eighth Floor
                                   Washington, DC 20005-2030
                                   (202) 362-3500 telephone
                                   (202) 362-3501 facsimile
                                   Email: alan.fisch@fischllp.com

                                   *Attorney for Plaintiff Imperium IP Holdings
                                   (Cayman), Ltd.*

# EXHIBIT 6

US007092029B1

(12) **United States Patent**
    Medwick et al.

(10) **Patent No.:**    **US 7,092,029 B1**
(45) **Date of Patent:**      **Aug. 15, 2006**

(54) **STROBE LIGHTING SYSTEM FOR DIGITAL IMAGES**

(75) Inventors: **Robert A. Medwick**, Aptos, CA (US); **Glenn Stark**, Santa Cruz, CA (US)

(73) Assignee: **ESS Technology, Inc.**, Fremont, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 430 days.

(21) Appl. No.: **09/816,038**

(22) Filed: **Mar. 22, 2001**

**Related U.S. Application Data**

(60) Provisional application No. 60/192,008, filed on Mar. 24, 2000.

(51) **Int. Cl.**
    *H04N 5/222*     (2006.01)
    *H04N 5/235*     (2006.01)
(52) **U.S. Cl.** ..................... **348/371**; 348/370; 348/229.1
(58) **Field of Classification Search** ................ 348/370, 348/371, 229.1, 300; 396/61, 157, 155
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,954,897 A * 9/1990 Ejima et al. ............. 348/229.1

| | | | | |
|---|---|---|---|---|
| 5,420,635 A | * | 5/1995 | Konishi et al. | 348/362 |
| 5,438,367 A | * | 8/1995 | Yamamoto et al. | 348/371 |
| 5,987,261 A | * | 11/1999 | Sugahara et al. | 396/61 |
| 6,151,073 A | * | 11/2000 | Steinberg et al. | 348/371 |
| 6,195,127 B1 | * | 2/2001 | Sugimoto | 348/370 |
| 6,674,466 B1 | * | 1/2004 | Takaoka | 348/224.1 |
| 6,825,884 B1 | * | 11/2004 | Horiuchi | 348/362 |

* cited by examiner

*Primary Examiner*—David Ometz
*Assistant Examiner*—Kelly Jerabek
(74) *Attorney, Agent, or Firm*—Farjami & Farjami LLP

(57)             **ABSTRACT**

An image sensor acquires a preparatory image that is lighted for a predetermined preparatory duration by a strobe. The preparatory image data corresponding to the preparatory image from the image sensor is processed and an average preparatory image luminance is determined based on the preparatory image data and weighting at least a subset of the preparatory image data. A supplemental strobe duration is generated based on the average preparatory image luminance and luminance weightings. The electronic image sensor may be activated to acquire an image with supplemental light provided by the supplemental strobe duration.

**28 Claims, 10 Drawing Sheets**



**U.S. Patent**      **Aug. 15, 2006**      **Sheet 1 of 10**      **US 7,092,029 B1**



FIG.1

**U.S. Patent**  Aug. 15, 2006  Sheet 2 of 10  US 7,092,029 B1



FIG.2

Case 1:15-cv-01059-CFC-CJB   Document 165   Filed 03/15/21   Page 56 of 130 PageID #: 3644

Case 4:14-cv-00371-RC-ALM   Document 1-3   Filed 06/09/14   Page 5 of 21 PageID #:  40



Memory 203

CameraOperationProcedure  220

ImageAcquisitionProcedu  re 222

ActivateStrobeProcedure  224

LUT 226

LuminanceWeightingTable  228

ImageData 230

CalibrateLUTProcedure  240

FIG.3

Case 1:15-cv-01059-CFC-CJB   Document 165   Filed 03/15/21   Page 57 of 130 PageID #: 3645

Case 4:14-cv-00371-RC-ALM   Document 1-3   Filed 06/09/14   Page 6 of 21 PageID #:  41



FIG. 4

U.S. Patent        Aug. 15, 2006        Sheet 5 of 10        US 7,092,029 B1



**FIG. 5**

U.S. Patent          Aug. 15, 2006          Sheet 6 of 10          US 7,092,029 B1

226

342                                                                344

| | |
|---|---|
| 50 us | 1000 |
| 25 us | 349 |
| 50 us | 981 |
| 75 us | 1453 |
| 100 us | 2075 |
| 400 us | 4217 |
| 800 us | 5387 |

Look-up Table
**FIG. 6**

**U.S. Patent**          Aug. 15, 2006          Sheet 7 of 10          **US 7,092,029 B1**



**FIG. 7**

U.S. Patent    Aug. 15, 2006    Sheet 8 of 10    US 7,092,029 B1



Blocks of Image Data

FIG. 8

Case 1:15-cv-01059-CFC-CJB   Document 165   Filed 03/15/21   Page 62 of 130 PageID #: 3650

Case 4:14-cv-00371-RC-ALM   Document 1-3   Filed 06/09/14   Page 11 of 21 PageID #:  46



Luminance Weighting Table
## FIG. 9

U.S. Patent          Aug. 15, 2006          Sheet 10 of 10          US 7,092,029 B1



**Calibrating the Look-up Table**
**FIG. 10**

US 7,092,029 B1

**1**

# STROBE LIGHTING SYSTEM FOR DIGITAL IMAGES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of Provisional Patent Application Ser. No. 60/192,008, filed on Mar. 24, 2000, and entitled STROBE FOR A DIGITAL CAMERA.

## BACKGROUND OF THE INVENTION

1. Technical Field

This invention relates generally to a strobe lighting system used in the capturing of for digital images.

2. Related Art

Digital cameras for capturing digital images are commercially available and allow individuals to create digital images, rather than images on film as with traditional cameras. In a digital camera, an image sensor measures reflected light from an object that is processed into a digital image.

Typically, digital cameras and other imaging products utilize image sensors (also known as electronic image sensors) that are solid-state devices. Examples of image sensors include charge-coupled device (CCD), charge injection devices (CID) and complementary metal oxide semiconductor (CMOS) imagers. The image sensors typically have a number of cells or pixels arranged along vertical and horizontal dimensions commonly referred to as a matrix (also known as a pixel array). Image sensors typically utilize off-chip signal processing to improve signal to noise (S/N) performance and compensate for reset noise. Image sensors may be found in various pixel array configurations, including SIF or QVGA 320×240, CIF 352×288, VGA 640×480, SVGA 800×600, XGA 1024×768, SxGA 1280×1024, 2 Mega pixel, 3 Mega pixel and 16 Mega pixels.

Image information sensed by each pixel of an image sensor is converted into a digital signal. The digital signal is created from the image information stored in the pixels of the pixel array and is output serial using an arrangement of shift registers (in the case of CCD) or via a row and column selection (in the case of CMOS imager). After the image information is converted into a digital signal referred to as image data, the image data is stored in a memory. The image data may be post processed by a digital signal processor (DSP) to improve the quality of the digital image.

An image sensor capable of capturing color images increase the complexity of processing the digital image data. In one approach, the image sensor has a geometric arrangement of cells forming a pixel responding to three primary colors, eg., red, green and blue. Since each cell senses a particular color, various algorithms are used to interpolate the missing color information. Alternately, two or more image sensors having different color sensitivity may be utilized and the image data combined by a signal processor.

When taking photographs with a traditional film camera, it is often desirable to have additional lighting to illuminate a subject. A "flash" is often utilized with a camera to provided illumination of the subject. Consequentially, problems exist when too much light or not enough light is reflected from the subject (also known as a object) onto the file. The problems of under exposure and over exposure result when too much light or too little light reach the film. Similar lighting problems exist with digital photography using an image sensor in place of film.

**2**

An image sensor utilized to capture an image has the same problems with subject lighting as traditional film cameras. A supplemental lighting source, such as a strobe, may be utilized with digital camera having an image sensor. The duration of the supplemental light is determined based on an average value of a preparatory image data. However, the amount of light generated does not correspond to a particular area of interest in the image. For example, in a portrait, the subject is typically placed in an area of interest in the center of the image; however, the supplemental light is generated based on the entire image, including the background. The light from the background behind the subject affects the calculation of the supplemental light in the same manner as the subject, and as such reduces the visual quality of the image. Therefore a system is needed to generate supplemental light that accords more weight to an area of interest of the image.

## SUMMARY

Broadly conceptualized, the invention is an approach to determine an average preparatory image luminance based on the preparatory image data and weighting at least a subset of the preparatory image data. Thus, the electronic image sensor is activated to acquire a photographic image. Supplemental light is provided in accordance with a supplemental strobe duration. Photographic image data corresponding to the photographic image from the electronic image sensor is captured. The duration of the supplemental strobe is adjusted based on the weighting of the luminance of the preparatory image, resulting in an increase in the visual quality of the exposed digital image.

Other systems, methods, features and advantages of the invention will be or will become apparent to one with skill in the art upon examination of the following figures and detailed description. It is intended that all such additional systems, methods, features and advantages be included within this description, be within the scope of the invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE FIGURES

The components in the figures are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention. In the figures, like reference numerals designate corresponding parts throughout the different views.

FIG. **1** is a block diagram of a digital camera having an electronic image sensor and supplemental light.

FIG. **2** is a block diagram of the digital camera of FIG. **1**.

FIG. **3** is a block diagram showing at least a portion of procedures and data stored in a memory block of FIG. **2**.

FIG. **4** is a block diagram of an exemplary electronic image sensor suitable for use in the digital camera of FIG. **1**.

FIG. **5** is a flowchart showing the calibration of the electronic image sensor of FIG. **4**.

FIG. **6** is a look-up table stored in the memory of FIG. **2**, as identified in FIG. **3**.

FIG. **7** is a flowchart of an activate strobe procedure of FIG. **3** and FIG. **5**.

FIG. **8** is an exemplary image data that is divided into blocks with a selected subset of spots having pixels that are arranged in a Bayer-pattern.

FIG. **9** is an exemplary luminance weighting table of FIG. **3**.

US 7,092,029 B1

**3**

FIG. **10** is a flowchart of a calibrate look-up table procedure of FIG. **3** and FIG. **5**.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following patent applications are incorporated by reference to assist in the description of certain elements and features of this invention. They are described in greater detail later in the specification, but include:

U.S. patent application, titled "Programmable Image Transform Processor for a Digital Camera," Ser. No. 09/188,871, filed Nov. 9, 1998;

U.S. patent application, titled "Programmable Timing Generator for a Digital Camera," Ser. No. 09/188,831, filed Nov. 9, 1998;

U.S. patent application, titled "Programmable Display Controller for a Digital Camera," Ser. No. 09/188,996, filed Nov. 9, 1998.

In FIG. **1**, a block diagram of a digital camera **100** having an electronic image sensor and supplemental light is shown. A lens **102** transmits the image-forming light **104** onto an electronic image sensor (image sensor) **106**. The image sensor **106** is built into the digital camera **100** and is located at the focal plane of the lens **102**. The image sensor **106** is typically a charge-coupled device (CCD), charge injection device (CID) or a complementary metal-oxide-semiconductor (CMOS) sensor.

Image sensors differ in the arrangement of the cells within the image sensor and the type of charge readout. The image sensor **106** connects to an electronic interface circuitry **108**. The electronic interface circuitry **108** also connects to a strobe **110**, a storage device **112** and a display **114**. The electronic interface circuitry **108** controls the amount of time that the strobe **110** is activated to generate supplemental light. The electronic interface circuitry **108** controls the storage device **112** and enables sensed images by the images sensor **106** to be stored. The storage device **112** may include a tape drive, a disk drive, such as a floppy disk drive, hard disk drive, optical disk drive, or magneto-optical disk drive, or an integrated circuit card with RAM or electrically erasable programmable read only memory (EEPROM). The storage device **112** may be inside the digital camera **100** or attached to the digital camera **100** externally. The electronic interface circuitry **108** can also control the display **114** to display the image sensed by the image sensor **106**. The display **114** may be inside the digital camera **100** or attached to the digital camera **100** externally. The display **114** is optional and the digital camera **100** may function without the display **114**. The electronic interface circuitry **108** may operate the display **114** in a viewfinder mode or a review, (i.e., picture image viewing) mode, if the display **114** is present.

FIG. **2** is a block diagram of the digital camera **100** of FIG. **1**. A microprocessor (RISC) **201** is coupled to a memory controller **202**, a programmable timing generator **204**, a frame capture processor **205**, a programmable image transform processor **206**, a storage medium **208** and a display controller **209**. The memory controller **202** is connected to a memory **203**. The display controller **209** is coupled to a display **210**. The image sensor **106** is coupled to an analog signal processor (ASP) **211** that converts to the analog-to-digital converter (A/D converter) **212**. The timing generator **204** is coupled to the image sensor **106**, ASP **211** and A/D converter **212**, the frame capture processor **205**, and the microprocessor **201**. The programmable image transform processor **206**, commonly called a digital signal pro-

**4**

cessor (DSP), and other elements read data from the write data to the memory **203** via the memory controller **202**. Preferably, the memory **203** includes a high-speed DRAM to store the digital image data. The A/D converter **212** supplies digital image data to the image transform processor **206**. The image transform processor **206** stores the digital image data in the memory **203**. The timing generator **204** supplies timing signals to the DSP **206** and A/D converter **212** to synchronize the transfer of digital image data between the A/D converter **212** and the frame capture processor **205**. The frame capture processor **205** supplies the digital image data to the DSP **206**. Alternately, the frame capture processor **205** stores the digital image data from the sensor directly into the memory **203**, and the DSP **206** fetches the data from the memory for further processing. The frame capture processor **205** supports real-time windowing, histogram, gamma correction, white balance, and auto-focus functions. A strobe circuit **216** interfaces the strobe **110** with the microprocessor **202**.

FIG. **3** is a block diagram showing at least a portion of procedures and data stored in a memory block of **203** of FIG. **2**. The memory **203** stores procedures and digital image data as follows:

A camera operation procedure **220** for controlling the overall operation of the digital camera **100**.

An image acquisition procedure **222** that acquires image data representing an image.

An activate strobe procedure **224** that operates the strobe **110**, FIG. **2**, when the image acquisition procedure **222** determines that supplemental light is needed. The image acquisition procedure **222** invokes the activate strobe procedure **224**.

A look-up table (LUT) **226** that is accessed by the activate strobe procedure **224** to determine a duration for activating the strobe **110**, FIG. **2**, when acquiring an image; preferably, the LUT **226** is stored in non-volatile memory such as an EEPROM.

A luminance weighting table **228** that is accessed by the activate strobe procedure **224** to determine the amount of weight given to portions of preliminary image data.

Image data **230** that includes preliminary image data; the image data **230** is a digital representation of the image sensed by the image sensor **106**, FIG. **1**.

A calibrate LUT procedure **240** that populates the LUT **226**; the calibrate LUT procedure **240** is loaded into the memory **203** from a storage medium **208**, FIG. **2**, such as a floppy disk, during the manufacturing process; once the LUT **226** is populated, the calibrate LUT procedure **240** is no longer stored in the memory **203**.

Referring to both FIG. **2** and FIG. **3**, the microprocessor (RISC) **201** executes the camera operation procedure **220**, which is stored in memory **203**. Alternately the camera operation procedure **220** may be stored in a ROM, or loaded into the memory **203** from the storage medium **208**. The digital camera **100** operation procedure **220** includes the image acquisition procedure **222**. When a user presses a store-image button (not shown), the camera operation procedure **220** causes the image sensor **106** to acquire an image. The image acquisition procedure **222** causes the microprocessor **201** to control the programmable timing generator **204** to generate vertical and horizontal clock signals for use the image sensor **106**. The image sensor **106** outputs image data comprising a series of analog signals corresponding to the color and intensity of the image sensed by each cell of the image sensor **106**. The image data is then sent to the ASP **211** and to the A/D converter **212**.

US 7,092,029 B1

**5**

The ASP **211** processes the image data before input to the A/D converter **212**. For example, the ASP has a programmable amplifier with adjustable gain, and also reduces or eliminates noise, such as reset noise, from the image data using methods well known to those in the art, such as correlation-double-sampling. The A/D converter **212** then converts the analog image data into digital image data. In an alternate embodiment, the ASP **211** is not utilized.

The digital image data is stored in memory **203**. Execution of the camera operation procedure **220** by the microprocessor **201** causes the digital image data to be processed by the programmable image transform processor **206**. The processed digital image data is compressed and recorded in memory **203**, on a storage medium **208** or transferred to display controller **209** for output to a display **210**.

To control the operation of the strobe **110**, the microprocessor **202** connects to a strobe circuit **216**. The strobe circuit **216** includes a high voltage power supply that supplies power to activate the strobe **110** in response to a signal from the microprocessor **201**. The image acquisition procedure **222** sends signals to the strobe circuit **216** causing the strobe **110** to generate supplemental light.

U.S. patent application, titled "Programmable Image Transform Processor for a Digital Camera," Ser. No. 09/188,871, filed Nov. 9, 1998, is incorporated by reference as information explaining the operation of the image transform processor **206**. U.S. patent application, titled "Programmable Timing Generator for a Digital Camera," Ser. No. 09/188,831, filed Nov. 9, 1998, is also incorporated by reference as information explaining the operation of the timing generator **204**. U.S. patent application, titled "Programmable Display Controller for a Digital Camera," Ser. No. 09/188,996, filed Nov. 9, 1998, is also incorporated by reference as information explaining the operation of the display controller **209**.

In FIG. **4**, a diagram of an exemplary electronic image sensor suitable for use in the digital camera **100** of FIG. **1** is shown. The image sensor **302** may be a CCD, CID or CMOS device. In the example implementation of a CCD, the image sensor **302** connects to the ASP **304** and the A/D converter **306**. The image sensor **302** has cells **308**, vertical shift registers **312** and a horizontal shift register **314**. Each cell **308** absorbs light and converts the light energy into an electrical charge. The amount of charge is a measure of light energy absorbed. The size of the image sensor determines the quality of the image. The quality of the image improves as the number of cells increases. Image sensors are available in many sizes, such as SIF or QVGA 320×240, CIF 352× 288, VGA 640×480, SVGA 800×600, XGA 1024×768, SxGA 1280×1024, 2 Mega pixel, 3 Mega pixel and 16 Mega pixels.

The components of the image sensor **302** are arranged along horizontal and vertical dimensions. An array **310** of cells **308** is arranged in the vertical dimension. The vertical shift register **312** has elements **316** for storing the charge sensed by the cells **308**. Each cell **308** in the array of cells **310** connects to a corresponding element **316** in the vertical shift register **312**.

Free charge moves from regions of higher potential to regions of lower potential. By alternating the voltages on the electrodes (not shown) connected to the cells **308** and the elements **316** and **318** of the shift registers **312** and **314** in proper phase, a charge packet, i.e., the charge from the cell **308**, can be moved from the cell **308** to an element **316** of the shift register **312** and then moved from one element to another element in the shift registers and finally to the image sensor **302** output.

**6**

Thus, when appropriate voltages are applied to the cell **308** and the corresponding element **316** in the vertical shift register **312**, the charge generated in the cell **308** is transferred out of the cell **308** to the corresponding element **316** in the vertical shift register **312**. The programmable timing generator is programmed to generate timing or clock signals that cause the transfer of the charge to occur at the appropriate time. When appropriate voltages are applied to adjacent elements of the vertical shift register **312**, the charge is transferred from one element to another. The last element or output of each vertical shift register **312** connects to a corresponding element **318** in the horizontal shift register **314**. When appropriate voltages are applied to the last element of the vertical shift register **312** and the corresponding element **318** of the horizontal shift register **314**, the charge is transferred from the vertical shift register **312** to the horizontal shift register **314**. When appropriate voltages are applied to adjacent elements of the horizontal shift register **314**, the charge is transferred from one element to another and finally output. The output of the horizontal shift register **314** connects to the ASP **304** via an output amplifier **320**.

The cells of the image sensor acquire an image or charge when exposed to light. Therefore, the image sensor has a port for receiving an OverFlowDrain pulse, or DumpCharge signal to reset the cells of the image sensor. The Dump-Charge signal is pulsed one or more times prior to the star of exposure. The exposure time begins after the last Dump-Charge pulse and ends when either a mechanical shutter is closed, or if an electronic shutter is used, when the accumulated charge in the cells is transferred to the vertical shift registers. A mass pixel transfer signal causes the image sensor to transfer the charge in its cells to the vertical shift registers to capture an image.

Various signals are utilized to control the image sensor and to synchronize its operation with other system components. An amplifier reset signal connects to the output amplifier **320**. XSHP and XSHD signals control the ASP **304** and an ADC clock signal connects to the A/D converter **306**. Horizontal clock signals H **1** and H **2** control the horizontal shift register **314**. Vertical clock signals V **1** to V n connect to a vertical clock driver **322** that generates signals V**1** to Vm to control the vertical shift registers. In one embodiment, signals V **1** to V n are binary signals, while signals V**1** to Vm are binary signals having three states.

Color imaging is more complex. In one method, the image sensor **302** has a geometric arrangement of cells to respond to three colors, e.g., red, green and blue. Alternately, two or more image sensors having different color sensitivity are used. In another embodiment, the image sensor **302** includes a color filter that causes either red, green or blue light to pass to the pixels on the image sensor in a predefined pattern, such as a Bayer pattern. Each pixel receives a single color, and the output from the image sensor includes a red, a green and a blue color channel.

It is appreciated by those of skill in the art that while a CCD has been described, the image sensor **106** may equally be implemented in a CID or CMOS imager. In the case of a CMOS imager, the image sensor may contain a photodiode, row-select transistor and a reset transistor per pixel in the pixel array. By activating a row, the data from the pixels in that row simultaneously copied into the columns. Each column will have a load transistor, column select switch, and a sampling switch. In this example the CMOS imager does not rely upon charge transfer such as the CCD. Unlike CCDs, the CMOS imager may be fully addressable and the pixels in the pixel array may be read out at high frame rates.

US 7,092,029 B1

**7**

FIG. **5** is a flowchart showing the calibration of the electronic image sensor of FIG. **4**. In step **330**, the calibrate look-up table procedure **240** populates the look-up table **226**. Steps **332**–**334** are implemented by the activate strobe procedure **224** of FIG. **4**. In step **332** the activate strobe procedure **224** acquires a preparatory image while generating preparatory light. To generate the preparatory light, the strobe is activated for a predetermined period of time, such as fifty microseconds. The exposure time of the preparatory image is short with respect to the exposure time of a photographic image to reduce the effect of any ambient light on the preparatory image.

For example, the exposure time of the preparatory image is approximately one millisecond, while the exposure time of the photographic image is approximately 33.3 milliseconds (1⁄30 second). The strobe is activated to generate the preparatory light shortly after the exposure time begins. In step **334**, the activate strobe procedure **224** determines a photographic image strobe duration based on a preparatory luminance of the preparatory image. In step **336**, the activate strobe procedure **240** acquires a photographic image by activating the strobe for the photographic image strobe duration. In step **338**, after acquiring the photographic image, the image acquisition procedure **240** performs additional adjustments to the photographic image. For example, the image acquisition procedure **240** may adjust the white-balance and color balance, enhance the edges, the perform chroma suppression to whiten the white areas and darken the black areas of the photographic image.

In FIG. **6**, a look-up table stored in the memory of FIG. **2**, as identified in FIG. **3** is shown. The look-up table **226** stores a strobe duration **342** and an associated power value **344**. The associated power value **344** represents a percentage of the luminance at the specified strobe duration divided by the luminance at a nominal strobe duration. In the look-up table, the first entry pair is 50 microseconds (s) with an associated power value of 100.0% and represents a nominal power value for a nominal average luminance at a preparatory strobe duration, which is discussed with reference to FIG. **10**. The subsequent durations from 25 s to 800 s have power values that are relative to the first 50 s entry. For example, for a strobe duration of 25 s, the power value is 34.9% of the power value of at the nominal 50 s duration. Alternately, the associated power values **344** represent fractions rather than a percentage.

FIG. **7** is a flowchart of an activate strobe procedure of FIG. **3** and FIG. **5**. Steps **352** and **354** of FIG. **7** provide more detail with respect to step **332** of FIG. **5**. Steps **358**–**364** of FIG. **7** provide more detail with respect to step **334** of FIG. **5**. In step **352**, the activate strobe procedure **224** releases the shutter to cause the image sensor to accumulate charge representing an image. In one embodiment, the shutter is released electronically by applying the DumpCharge Signal of FIG. **4** to the image sensor **106** of FIG. **2** to remove any accumulated charge from the cells of the image sensor. In an alternate embodiment, a mechanical shutter is opened to allow the image sensor to receive light. In step **354**, the activate strobe procedure **224** generates preparatory light by activating the strobe for a predetermined preparatory duration. In step **356**, the activate strobe procedure **224** captures preparatory image data associated with the preparatory image. The activate strobe procedure **224** captures preparatory image data associated with the charge accumulated on the image sensor and stores the preparatory image data in the memory.

In step **358**, the activate strobe procedure **224** determines an average block luminance for subsets of the preparatory

**8**

image data. In one embodiment, steps **356** and **358** are performed concurrently. Alternately, steps **356** and **358** are performed sequentially. Preferably, the preparatory image has sixty-four subsets or blocks and each subset has an average block luminance. The blocks are rectangular and the number of pixels in a block varies depending on the size of the image sensor.

The pixels on the sensor are arranged behind a red-green-blue filter having a Bayer-pattern. The symbol "R" refers to a pixel behind the red filter, the symbol "G" refers to a pixel behind the green filter, and the symbol "B" refers to a pixel behind the blue filter. The arrangement of the filters and pixels is as follows:

R G R G R G . . .

    X

G B G B G B . . .

A digital value corresponding to an intensity of the amount of light impinging on a pixel is stored in the memory. The intensity of a red pixel is $I_R$, the intensity of a

$$0.1I_B + 0.3I_R + 0.6I_G \qquad (1)$$

greed pixel is $I_G$, and the intensity of a blue pixel is $I_B$. The following relationship is used to determine the luminance for a group of pixels referred to as a spot, as designated by the "X" above:

Because there are two green pixels, the intensity $I_G$ is equal to the average intensity of the two green pixels. Alternately, relationship one is modified by reducing the 0.6 factor to 0.3, and adding the intensity of the green pixels, $I_{G1}$ and $I_{G2}$, as shown in relationship two as follows:

$$0.1I_B + 0.3I_R + 0.3(I_{G1} + I_{G2}) \qquad (2)$$

Referring also to FIG. **8**, the image data **230** has many blocks **380**. Each block **380** includes a rectangular array of pixels. The luminance is determined for a plurality of spots **382** within each block **380**. The plurality of spots is selected in accordance with a predetermined spot pattern. In this example, the spot pattern is four spots across an approximate horizontal centerline of the block **380**, and six spots aligned with an approximate vertical centerline of the block **380**. The image data for an exemplary group of pixels **384** is used to determine the luminance of the spot **382** using relationship one above. The luminance of the plurality of spots **382** is summed to generate the average block luminance for the block **380**. In an alternate embodiment, the luminance of the plurality of spots **382** is summed to provide an intermediate sum that is divided by the number of spots in the plurality of spots to generate the average block luminance for block **380**.

Referring back to FIG. **7**, in step **360**, the activate strobe procedure **224** applies a weight to the average block luminance by multiplying the average block luminance, for at least a subset of the blocks, by a respective weight from the luminance weighting table to generate weighted block luminances.

Referring to FIG. **9**, an exemplary luminance weighting table of FIG. **3** is shown. Each block **380** is associated with a predetermined weight **386** in the luminance weighting table **228**. The weights in the luminance weighting table **228** apply the greatest weight to the luminance values in the center foreground of the image, and especially enhance the visual quality of portraits. In an alternate embodiment, the weights of the luminance weighting table **228** are adjusted for other types of images such as landscapes. In another embodiment, the values in the luminance weighting table are adjusted in response to a user selecting the type of photo-

US 7,092,029 B1

**9**

graph they are taking. In yet another alternate exemplary luminance weighting table, the luminance weighting table provide uniform weights.

In step **362**, the activate strobe procedure **224** sums the weighted block luminances to generate the average image weighted luminance value for the preparatory image data. In step **364**, the activate strobe procedure **224** determines the photographic image strobe duration for the strobe by accessing the look-up table **226** of FIG. **6** in accordance with a relationship between the average image weighted luminance and a target luminance where the target luminance is equal to eighty. The activate strobe procedure **224** divides the target luminance by the average image weighted luminance to generate a target power factor. Since the strobe power is proportional to the luminance, the target power factor represents an increase or decrease in strobe power and results in a photographic image having sufficient image quality.

The activate strobe procedure **224** determines a preparatory power value associated with the preparatory strobe activation from the look-up table **226** of FIG. **6** from the first 50 s entry, and multiplies the preparatory power value by the target power factor to generate a photographic image power value. The activate strobe procedure **224** accesses the look-up table a second time to identify upper and lower calibration power values that are closest to the photographic image power value, and generates the photographic image strobe duration by performing a linear interpolation between the upper and lower power values and target value, and the respective upper and lower calibration durations. In an alternate embodiment, the activate strobe procedure **224** accesses the look-up table **226** a second time to identify a calibration power value closest to the photographic image power value, and sets the photographic image strobe duration equal to the duration associated with the identified calibration power value in the table **226**.

When the activate strobe procedure **224** accesses the look-up table for the second time, the power values and durations for the second through final entries are used, and the power value and duration for the first 50 s entry is not used. Using the second through final entries provides a strobe duration for the photographic image that compensates for charge lost in the high voltage supply of the strobe circuit from activating the strobe for preparatory duration to acquire the preparatory image.

FIG. **10** is a flowchart of a calibrate look-up table procedure of FIG. **3** and FIG. **5**. FIG. **10** provides more detail with respect to step **330** of FIG. **5**. To calibrate the look-up table, the calibrate look-up table procedure **240** is loaded into the memory of the digital imager. The digital imager is placed in a darkened box that substantially eliminates ambient light, and is aimed at a test surface three feet away. The test surface is an eighteen percent gray surface, which reflects eighteen percent of the incident light.

In step **402**, the calibrate look-up table procedure **240** determines a nominal average luminance at the preparatory strobe duration. The calibrate look-up table procedure **240** activates the strobe for the preparatory strobe duration a predetermined number of times, such as ten. After each activation of the strobe, the calibrate look-up table procedure **240** measures the average luminance for that activation. To measure the average luminance, a block of pixels in the center ten percent of the image sensor is identified. In one implementation, the block of pixels is ninety pixels wide and ninety pixels high. Because the eye is most sensitive to green, the green pixels in the block are used to determine the luminance. The intensity value of the green pixels in the block is summed and divided by the number of green pixels

**10**

to generate the average luminance for a single activation of the strobe. After the strobe has been activated for the predetermined number of times, the average luminances are summed and divided by the predetermined number of strobe activations to generate the nominal average luminance. By generating the nominal average luminance by activating the strobe multiple times, deviations in the luminance are included in the average. However, in an alternate embodiment, when an average luminance exceeds an upper threshold value, or is below a lower threshold value for the calibration strobe duration, the strobe or strobe circuit may be defective, and the calibrate look-up table procedure **240** provides an operator with an indication of a possible defect.

After determining the nominal average luminance, the strobe is activated for various calibration durations. A relationship between the nominal average luminance and an average calibration luminance at various calibration durations is measured and stored in the look-up table. In step **404**, the calibrate look-up table procedure **240** sets a calibration strobe duration equal to an initial calibration duration, such as twenty-five microseconds. In step **406**, the calibrate look-up table procedure **240** sets the value of a calibration counter equal to zero. The calibration counter is used to count a number of times that the strobe is activated for a specified calibration duration.

In step **408**, the strobe is activated for the preparatory strobe duration to discharge a capacitor in the high voltage supply in the strobe interface circuit. In this way, the look-up table is calibrated under conditions more closely resembling normal operation. After activating the strobe, the calibrate look-up table procedure **240** waits approximately fifty milliseconds. In step **410**, the calibrate look-up table procedure **240** dumps any accumulated charge from the image sensor and releases the shutter to acquire an image, as described above. In step **412**, the calibrate look-up table procedure **240** activates the strobe to generate calibration light for the specified calibration strobe duration. In step **414**, the calibrate look-up table procedure **240** measures and stores the average luminance for the image at the specified calibration strobe duration, and also stores the associated calibration strobe duration. The average luminance is measured as previously described with respect to step **402**. In step **416**, the calibrate look-up table procedure **240** increments the value of calibration counter by one. In step **418**, the calibrate look-up table procedure **240** determines whether the value of the calibration counter is equal to a predetermined maximum calibration count value (N). Preferably, the maximum calibration count value is greater than one. In an alternate embodiment, the maximum calibration count value is equal to two. Having more than one average luminance reduces the effect of aberrations in a measurement. If step **418** determines that the value of the calibration counter is not equal to the maximum calibration count value (N), steps **408** through **418** are repeated to generate an additional average luminance at the specified calibration strobe duration.

If step **418** determines that the value of the calibration counter is equal to the maximum calibration count value (N), then in step **420**, the calibrate look-up table procedure **240** updates the look-up table for the calibration strobe duration. The calibrate look-up table procedure **240** generates a calibration average luminance by summing the average luminances for the specified calibration strobe duration and dividing that sum by the value of the calibration counter. The calibrate look-up table procedure **240** determines a percentage of the calibration average luminance with respect to the nominal average luminance, and stores the calibration strobe duration and percentage in the look-up table.

US 7,092,029 B1

**11**

In step **422**, the calibrate look-up table procedure **240** increases the calibration strobe duration. In one embodiment, the calibration strobe duration is increased in equal increments. In another embodiment, the calibration strobe duration is increased non-linearly as follows: 25 microseconds (s), 50 s, 75 s, 100 s, 250 s, 500 s, 750 s and 1000 s. The initial calibration strobe duration is 25 microseconds. The calibration strobe duration is increased in 25 s increments until the calibration strobe duration equal 100 s. The calibration strobe duration is then increased to 250 s, and then increased in 250 s increments until the calibration strobe duration is equal to 1000 s. In another alternate embodiment, after measuring at the calibration strobe duration of 100 s, the calibration strobe duration is increased to 400 s and 800 s, as shown in FIG. **6**. These calibration strobe durations were chosen because the strobe does not generate light linearly with respect to the duration of activation of the strobe. The greatest change in luminance is in the shorter strobe durations.

In step **424**, the calibrate look-up table procedure **240** determines whether the calibration strobe duration is greater than a maximum strobe duration. If not, the calibrate look-up table procedure **240** repeats steps **406**–**424**. If so, then the look-up table is calibrated.

In an alternate embodiment, the average luminance is determined using the red, green and blue color channels as described above with respect to FIG. **7**, rather than only the green color channel. Although the strobe has been described with respect to an exemplary electronic digital camera, the strobe can be used with electronic scanners and copiers. In addition, the present invention can be used with portable electronic devices having an image sensor and light source to illuminate an object, such as a personal digital assistant (PDA). While various embodiments of the invention have been described, it will be apparent to those of ordinary skill in the art that many more embodiments and implementations are possible that are within the scope of this invention.

What is claimed is:

**1**. A method of adjusting image lighting, the method comprising:

generating a preparatory light for a predetermined preparatory duration;

capturing a preparatory image while generating the preparatory light, wherein the preparatory image is represented by preparatory image data;

determining an average preparatory image luminance of the preparatory image based on the preparatory image data and weighting at least a subset of the preparatory image data;

generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings; and

generating a look-up table storing associated image strobe durations and power values including a preparatory image strobe duration and associated preparatory power value.

**2**. The method of claim **1** wherein the generating the supplemental strobe duration further comprises:

generating average block luminances for subsets of the preparatory image data;

applying the luminance weightings to at least a subset of the average block luminances to generate weighted average block luminance; and

determining the average image luminance based on the weighted average block luminance.

**12**

**3**. The method of claim **2** wherein the luminance weightings are stored in a weighting table, and the applying further comprises:

accessing the weighting table to retrieve respective luminance weightings corresponding to portions of the preparatory image; and

multiplying the average block luminance by the respective luminance weightings to provide the average weighted block luminance.

**4**. The method of claim **1**, further comprising:

generating an adjustment factor by dividing a predetermined target luminance by the average image luminance;

multiplying the preparatory luminance power value by the adjustment factor to generate a target luminance power value; and

identifying, in the look-up table, an identified strobe duration corresponding to the target luminance power value, the identified strobe duration being the supplemental strobe duration.

**5**. The method of claim **1**, wherein generating the supplemental strobe duration further comprises:

generating a light adjustment factor by dividing a predetermined target luminance by the average image luminance;

multiplying the preparatory power value by the light adjustment factor to generate a target look-up table power value;

identifying, from the look-up table, first and second look-up table power values that are greater and less than, respectively, the target look-up table power value, the first and second look-up table power values having associated first and second image strobe durations; and

generating a final image strobe duration by interpolating the first and second image strobe durations in accordance with the target look-up table power value.

**6**. The method of claim **1** further comprising:

accessing the look-up table based on the average image luminance.

**7**. A memory having machine readable instructions for execution by a processor to adjust image lighting, the memory comprising:

a first set of machine readable instructions for acquiring a preparatory image while generating a preparatory light for a predetermined preparatory duration;

a second set of machine readable instructions for determining an average preparatory image luminance based on preparatory image data associated with the preparatory image and weighting at least a subset of the preparatory image data;

a third set of machine readable instructions for generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings; and

a set of machine readable instructions for generating a look-up table that stores associated image strobe durations and power values including a preparatory image strobe duration and an associated preparatory power value.

**8**. The memory of claim **7**, wherein the machine readable instructions that generate the supplemental strobe duration further include:

a fourth set of machine readable instructions for generating average block luminances for subsets of the preparatory image data;

US 7,092,029 B1

**13**

a fifth set of machine readable instructions applying the luminance weightings to at least a subset of the average block luminances to generate weighted average block luminance; and

a sixth set of machine readable instructions for determining the average image luminance based on the weighted average block luminance.

**9**. The memory of claim **8**, further comprising:

a seventh set of machine readable instructions for storing the luminance weightings in a weighting table;

a eighth set of machine readable instructions for accessing the weighting table to retrieve respective luminance weightings corresponding to portions of the preparatory image; and

a ninth set of machine readable instructions for multiplying the average block luminance by the respective luminance weightings to provide the average weighted block luminance.

**10**. The memory of claim **7**, further comprising machine readable instructions that include:

an eleventh set of machine readable instructions for multiplying the preparatory luminance power value by the adjustment factor to generate a target luminance power value; and

a twelfth set of machine readable instructions for identifying, in the look-up table, an identified strobe duration corresponding to the target luminance power value, the identified strobe duration being the supplemental strobe duration.

**11**. The memory of claim **7**, further comprising:

a fourteenth set of machine readable instructions for generating a light adjustment factor by dividing a predetermined target luminance by the average image luminance;

a fifteenth set of machine readable instructions for multiplying the preparatory power value by the light adjustment factor to generate a target look-up table power value;

a sixteenth set of machine readable instructions for identifying, from the look-up table, first and second look-up power values that are greater and less than, respectively, the target look-up table power value, the first and second look-up table power values having associated first and second image strobe durations; and

a seventeenth set of machine readable instructions for generating a final image strobe duration by interpolating the first and second image strobe durations in accordance with the target look-up table power value.

**12**. The memory of claim **7**, wherein the instructions that determine the supplemental strobe duration access the look-up table based on the average image luminance and at least one luminance power value is used to generate the supplemental strobe duration.

**13**. The memory of claim **12**, wherein the eighteenth set of machine readable instructions for generating the look-up table, include:

a nineteenth set of machine readable instructions for capturing a set of calibration images, each calibration image being associated with a predetermined calibration strobe duration, one calibration strobe duration being substantially equal to the preparatory image strobe duration; and

a twentieth set of machine readable instructions for generating power values corresponding to each calibration image with respect to a luminance value associated with the predetermined preparatory duration.

**14**

**14**. A digital imaging system comprising:

a processor electrically connected to a strobe;

an image sensor coupled to a memory, where a supplemental strobe duration stored in the memory is generated from a preparatory image received at the processor from the image sensor when the strobe is activated to generate a preparatory light for a predetermined preparatory duration;

wherein the processor accesses a look-up table in the memory that stores image strobe durations and power values including a preparatory image strobe duration and an associated preparatory power value.

**15**. The digital image system of claim **14**, wherein the processor divides the preparatory image data into subsets and generates average block luminances for each subset and applies the luminance weightings to at least a subset of the average block luminances, resulting in weighted average block luminance used to derive the weighted average image luminance.

**16**. The digital image system of claim **14**, wherein the memory has a weighting table that stores the luminance weighting.

**17**. The digital image system of claim **14**, wherein the processor generates an adjustment factor by dividing a predetermined target luminance by the average image luminance power value and then multiplying the adjustment factor by the preparatory luminance power value to derive the target luminance power value that corresponds to an identified strobe duration in the look-up table.

**18**. A method of adjusting image lighting on a preparatory image, the method comprising:

generating a preparatory light for a predetermined preparatory duration;

determining an average preparatory image luminance of the preparatory image represented by preparatory image data based on the preparatory image data and weighting at least a subset of the preparatory image data;

generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings;

generating a look-up table storing associated image strobe durations and power values including a preparatory image strobe duration and associated preparatory power value;

generating an adjustment factor by dividing a predetermined target luminance by the average image luminance;

multiplying the preparatory luminance power value by the adjustment factor to generate a target luminance power value; and

identifying, in the look-up table, an identified strobe duration corresponding to the target luminance power value, the identified strobe duration being the supplemental strobe duration.

**19**. A method of adjusting image lighting on a preparatory image, the method comprising:

generating a preparatory light for a predetermined preparatory duration;

determining an average preparatory image luminance of the preparatory image represented by preparatory image data based on the preparatory image data and weighting at least a subset of the preparatory image data; and

generating a supplemental strobe duration based on the average preparatory image luminance and luminance

US 7,092,029 B1

**15**

weightings, wherein generating the supplemental strobe duration further comprises

generating a look-up table storing associated image strobe durations and luminance power values including a preparatory image strobe duration and a preparatory power value;

generating a light adjustment factor by dividing a predetermined target luminance by the average image luminance;

multiplying the preparatory power value by the light adjustment factor to generate a target look-up table power value;

identifying, from the look-up table, first and second look-up table power values that are greater and less than, respectively, the target look-up table power value, the first and second look-up table power values having associated first and second image strobe durations; and

generating a final image strobe duration by interpolating the first and second image strobe durations in accordance with the target look-up table power value.

**20**. A method of adjusting image lighting on a preparatory image, the method comprising:

generating a preparatory light for a predetermined preparatory duration;

determining an average preparatory image luminance of the preparatory image represented by preparatory image data based on the preparatory image data and weighting at least a subset of the preparatory image data;

generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings;

generating a look-up table storing associated image strobe durations and luminance power values including a preparatory image strobe duration and a preparatory power value; and

accessing the look-up table based on the average image luminance.

**21**. A memory having machine readable instructions for execution by a processor to adjust image lighting on a preparatory image, the memory comprising:

a first set of machine readable instructions for acquiring a preparatory image;

a second set of machine readable instructions for determining an average preparatory image luminance based on preparatory image data associated with the preparatory image and weighting at least a subset of the preparatory image data;

a third set of machine readable instructions for generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings;

a fourth set of machine readable instructions for generating a look-up table that stores associated image strobe durations and power values including a preparatory image strobe duration and an associated preparatory power value;

a fifth set of machine readable instructions for multiplying the preparatory luminance power value by the adjustment factor to generate a target luminance power value; and

a sixth set of machine readable instructions for identifying, in the look-up table, an identified strobe duration

**16**

corresponding to the target luminance power value, the identified strobe duration being the supplemental strobe duration.

**22**. A memory having machine readable instructions for adjusting image lighting on a preparatory image, the memory comprising:

a first set of machine readable instructions for acquiring a preparatory image;

a second set of machine readable instructions for determining an average preparatory image luminance based on preparatory image data associated with the preparatory image and weighting at least a subset of the preparatory image data;

a third set of machine readable instructions for generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings;

a fourth set of machine readable instructions for generating a look-up table that stores associated image strobe durations and luminance power values including a preparatory image strobe duration and a preparatory power value;

a fifth set of machine readable instructions for generating a light adjustment factor by dividing a predetermined target luminance by the average image luminance;

a sixth set of machine readable instructions for multiplying the preparatory power value by the light adjustment factor to generate a target look-up table power value;

a seventh set of machine readable instructions for identifying, from the look-up table, first and second look-up power values that are greater and less than, respectively, the target look-up table power value, the first and second look-up table power values having associated first and second image strobe durations; and

a eighth set of machine readable instructions for generating a final image strobe duration by interpolating the first and second image strobe durations in accordance with the target look-up table power value.

**23**. A memory having machine readable instructions for adjusting image lighting on a preparatory image, the memory comprising:

a first set of machine readable instructions for acquiring a preparatory image;

a second set of machine readable instructions for determining an average preparatory image luminance based on preparatory image data associated with the preparatory image and weighting at least a subset of the preparatory image data;

a third set of machine readable instructions for generating a supplemental strobe duration based on the average preparatory image luminance and luminance weightings; and

a fourth set of machine readable instructions for generating a look-up table that stores associated image strobe durations and luminance power values including a preparatory image strobe duration and a preparatory power value, wherein the instructions that determine the supplemental strobe duration access the look-up table based on the average image luminance and at least one luminance power value is used to generate the supplemental strobe duration.

**24**. The memory of claim **23**, wherein the fourth set of machine readable instructions for generating the look-up table, include:

a fifth set of machine readable instructions for capturing a set of calibration images, each calibration image being associated with a predetermined calibration

US 7,092,029 B1

**17**

strobe duration, one calibration strobe duration being substantially equal to the preparatory image strobe duration; and

a sixth set of machine readable instructions for generating power values corresponding to each calibration image with respect to a luminance value associated with the predetermined preparatory duration.

**25**. A digital imaging system comprising:

a processor electrically connected to a strobe; and

an image sensor coupled to a memory, where a supplemental strobe duration stored in the memory is generated from a preparatory image received at the processor from the image sensor when the strobe is activated to generate a preparatory light for a predetermined preparatory duration;

wherein the processor accesses a look-up table in the memory that stores image strobe durations and power values including a preparatory image strobe duration

**18**

and an associated preparatory power value to generate an adjustment factor by dividing a predetermined target luminance by the average image luminance power value and then multiplying the adjustment factor by the preparatory luminance power value to derive the target luminance power value that corresponds to an identified strobe duration in the look-up table.

**26**. The method of claim **1** wherein, the capturing captures a single preparatory image.

**27**. The memory of claim **7**, wherein the first set of machine readable instructions acquires a single preparatory image.

**28**. The digital image system of claim **14**, wherein the supplemental strobe duration stored in the memory is generated from a single preparatory image.

\*   \*   \*   \*   \*

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| IMPERIUM IP HOLDINGS (CAYMAN), LTD., | § § § | |
| *Plaintiff*, | § § | Case Number: 4:14-cv-00371-ALM |
| v. | § § § | |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, and SAMSUNG SEMICONDUCTOR, INC., | § § § § § § § | |
| *Defendants*. | § | |

---

**PLAINTIFF IMPERIUM IP HOLDINGS (CAYMAN), LTD.'S
PATENT RULE 3-1 AND 3-2 DISCLOSURES**

Pursuant to Patent Rule 3-1 and 3-2, Plaintiff Imperium IP Holdings (Cayman), Ltd. ("Imperium") hereby submits its Disclosure of Asserted Claims and Infringement Contentions and accompanying disclosure against defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, and Samsung Semiconductor, Inc. (collectively, "Samsung Electronics").

**1.      Identification of Asserted Claims**

Based on the information presently available, Imperium hereby discloses, pursuant to P.R. 3-1(a), the claims of each patent-in-suit that it contends are infringed by Samsung Electronics as follows:

United States Patent No. 6,271,884:  Claims 1-6, 14, 17-19.

United States Patent No. 7,092,029:  Claims 1, 6, 7, 14, 16.

1

**A070**

United States Patent No. 6,836,290:  Claims 1, 10.

Imperium expressly reserves the right to modify, amend, and/or supplement the foregoing in light of the discovery that Samsung Electronics produces, none of which has been provided at present, and/or based on the Court's claim construction.

**2.    Identification of Accused Apparatuses**

Based on the information presently available, Imperium hereby discloses, pursuant to P.R. 3-1(b), the following accused apparatuses, products, devices, processes, methods, acts or other instrumentalities of which it is currently aware and that it contends infringe, either directly, indirectly, contributorily or by inducement, the asserted claims of the patents-in-suit: Alias, ATIV Book 8, ATIV Book 9, ATIV Book 9 Lite, ATIV Book 9 Plus, ATIV S, CL65, Conquer 4G, Galaxy Ace, Galaxy Alpha, Galaxy Camera, Galaxy Camera 2, Galaxy Nexus, Galaxy Note 2, Galaxy Note 3, Galaxy Note 4, Galaxy Note Edge, Galaxy Portal, Galaxy S II Epic 4G Touch, Galaxy S2, Galaxy S3, Galaxy S4, Galaxy S4 Mini, Galaxy S5, Galaxy S5 Active, Galaxy S5 Sport, Galaxy Stellar, Galaxy Tab 10.1, Galaxy Tab 10.1v, Galaxy Tab 2 10.1, Galaxy Tab 2 7.0, Galaxy Tab 7.0, Galaxy Tab 7.7, Galaxy Tab 8.9, Galaxy Wi-Fi Camera, Galaxy NX, NX-5, NX-10, NX-100, NX-1000, NX-11, NX-1100, NX-20, NX-200, NX-2000, NX-210, NX-30, NX-300, Intensity II, MV900, MV900F, Nexus S, NP-R580, NP-RC512, Pixon 12, Series 3, Series 5, Series 5 Ultratouch, Series 6, Series 7, Series 7 Chronos, Series 9, W350, WB350F, WB800F, WB850F, WB855F, Digimax S500, Digimax S600, DV150F, DV300F, ES80, ES81, EX2F, GX-10, GX-20, HZ10W, HZ15W, i85, L100, L200, NV11, NV15, NV3, NV4, NV40, PL90, PL120, PL121, PL170, PL171, PL20, PL21, PL210, PL211, S630, S730, S750, S73, S760, S85, S850, S860, SH100, SL102, SL202, SL30 SL40, SL420, SL50, SL600, SL605, SL720, SL820, ST150F, ST151F, ST152F, ST72, ST73, ST200F, ST600, ST65, ST67, ST66, ST68, ST700, ST75, ST76, ST77, ST78, ST79, ST90, ST91, TL105, TL110, TL205, TL210,

2

TL220, TL225, TL320, TL350, TL90, WB100, WB101, WB150, WB150F, WB200F, WB201F, WB202F, WB210, WB2100, WB2200F, WB250, WB250F, WB30F, WB31F, WB32F, WB350, WB350F, WB750, WB800F, WB850F, WB855F.  Each of the foregoing products is also identified in the claim charts attached as Appendices 1.1-1.63, 2.1-2.130, and 3.1-3.64.

In addition, Imperium asserts that various other mobile phones, tablet computers, laptop computers, cameras, and other devices with image sensors and image processors incorporated therein made, used, sold, offered for sale and/or imported by Samsung Electronics infringe the asserted claims of the patents-in-suit in the same or a substantially similar manner (including, but not limited to, by incorporating the same image sensors and/or image processors therein), which will be revealed during discovery.

Imperium expressly reserves the right to modify, amend, or supplement the foregoing list of accused apparatuses in light of the discovery that Samsung Electronics produces, none of which has been provided at present, and/or based on the Court's claim construction.

**3.    Claim Charts**

Pursuant to P.R. 3-1(c), Imperium attaches hereto the following exhibits identifying in chart form where each element of each asserted claim is found within the accused instrumentalities identified above: Appendices 1.1-1.63 ('884 patent); Appendices 2.1-2.130 ('029 patent); Appendices 3.1-3.64 ('290 patent).

Imperium expressly reserves the right to modify, amend, or supplement the foregoing claim charts in light of the discovery that Samsung Electronics produces, none of which has been provided at present, and/or based on the Court's claim construction.

**4.    Literal Infringement or Infringement Under the Doctrine of Equivalents**

Pursuant to P.R. 3-1(d), Imperium asserts that each element of each claim is literally present in each of the accused instrumentalities.  To the extent any claim is found not be literally

3

Date: January 26, 2015                  Respectfully submitted,

/s/ *R. William Sigler*
Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler (*pro hac vice*)
*bill.sigler@fischllp.com*
Jennifer K. Robinson (*pro hac vice*)
*jennifer.robinson@fischllp.com*
FISCH SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
Tel: (202) 362-3500

Silvia Jordan (*pro hac vice*)
*silvia.jordan@fischllp.com*
FISCH SIGLER LLP
432 Park Avenue South
Fourth Floor
New York, NY 10016
Tel: (212) 235-0440

David M. Saunders (*pro hac vice*)
*david.saunders@fischllp.com*
Desmond Jui (*pro hac vice*)
*desmond.jui@fischllp.com*
FISCH SIGLER LLP
96 North Third Street
Suite 260
San Jose, CA 95112
Tel: (650) 362-8200

*Attorneys for Imperium IP Holdings
(Cayman), Ltd.*

6

# EXHIBITS 8-20 Redacted in Their Entirety

# EXHIBIT 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IMPERIUM IP HOLDINGS (CAYMAN), LTD., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 4:14-cv-00371-ALM |
| SAMSUNG ELECTRONICS CO., LTD., et al., | § § § | |
| Defendants. | § § § § § | |

---

## IMPERIUM'S NOTICE OF ASSERTED CLAIMS AND ACCUSED PRODUCTS

---

To narrow this case for trial, Imperium respectfully submits this Notice of Asserted Claims and Accused Products.

Imperium will assert only the following claims at trial:

| Patent | Asserted Claims |
|---|---|
| '290 Patent | 1, 10 |
| '884 Patent | 1, 5, 6, 14, 17, 18, 19 |
| '029 Patent | 1, 6, 7 |

Imperium will not accuse the following Samsung products of infringement at trial:  ATIV Book 8, ATIV Book 9, ATIV Book 9 Lite, Series 5 Ultratouch, Series 6, Series 7 (non-Chronos), Series 9, ES80, EX2F, Galaxy Camera, Galaxy NX, Galaxy Wi-Fi Camera, HZ10W, HZ15W, MV900F, NV4, NV15, NV40, PL90, PL170, S85, S630, S730, SL40, SL720, SL820, ST90, ST200F, ST600, and TL90.

Imperium reserves the right to further narrow the case prior to trial.

1

Dated: November 25, 2015    Respectfully submitted,

             /s/ *Jeffrey M. Saltman*
             Alan M. Fisch
             *alan.fisch@fischllp.com*
             R. William Sigler (*pro hac vice*)
             *bill.sigler@fischllp.com*
             Jeffrey M. Saltman (*pro hac vice*)
             *jeffrey.saltman@fischllp.com*
             FISCH SIGLER LLP
             5301 Wisconsin Avenue NW
             Fourth Floor
             Washington, DC 20015
             Tel: (202) 362-3500

             Silvia Jordan (*pro hac vice*)
             *silvia.jordan@fischllp.com*
             FISCH SIGLER LLP
             432 Park Avenue South
             Fourth Floor
             New York, NY 10016
             Tel: (212) 235-0440

             David M. Saunders (*pro hac vice*)
             *david.saunders@fischllp.com*
             FISCH SIGLER LLP
             96 North Third Street
             Suite 260
             San Jose, CA 95112
             Tel: (650) 362-8200

             *Attorneys for Imperium IP Holdings*
             *(Cayman), Ltd.*

**A801**

# EXHIBITS 22-23 Redacted in Their Entirety

# EXHIBIT 24



GT-N7100

# User Manual

www.samsung.com

SAM-371_00044608

# Table of Contents

## Getting started

| | |
|---|---|
| 8 | Device layout |
| 9 | Buttons |
| 10 | S Pen |
| 10 | Package contents |
| 11 | Installing the SIM or USIM card and battery |
| 14 | Charging the battery |
| 16 | Inserting a memory card |
| 18 | Turning the device on and off |
| 19 | Holding the device |
| 19 | Locking and unlocking the device |
| 19 | Adjusting the volume |
| 20 | Switching to silent mode |

## Basics

| | |
|---|---|
| 21 | Indicator icons |
| 22 | Using the touch screen |
| 25 | Control motions |
| 32 | Page Buddy |
| 32 | Activating Multi Window |
| 33 | Using the S Pen |
| 37 | S Pen Air View |
| 38 | S Pen Keeper |
| 38 | Quick Command |

| | |
|---|---|
| 39 | Notifications |
| 40 | Home screen |
| 42 | Using widgets |
| 42 | Using applications |
| 43 | Applications screen |
| 44 | Help |
| 44 | One-handed operation |
| 45 | Entering text |
| 47 | Connecting to a Wi-Fi network |
| 48 | Setting up accounts |
| 49 | Transferring files |
| 50 | Securing the device |
| 52 | Upgrading the device |

## Communication

| | |
|---|---|
| 53 | Phone |
| 58 | Contacts |
| 62 | Messaging |
| 63 | Email |
| 65 | Google Mail |
| 66 | Talk |
| 67 | Google+ |
| 67 | Messenger |
| 68 | ChatON |

SAM-371_00044612

**A829**

Table of Contents

# Web & network

69   Internet
71   Chrome
72   Bluetooth
73   AllShare Cast
73   AllShare Play
74   Group Cast
75   NFC
76   S Beam

# Media

77   Music Player
78   Camera
85   Gallery
88   Paper Artist
89   Video Player
90   YouTube
91   FM Radio
92   Flipboard

# Application & media stores

93   Play Store
94   Samsung Apps
94   S Suggest
95   Game Hub
95   Readers Hub
95   Video Hub

# Utilities

96   S Note
99   S Planner

101   Dropbox
102   Cloud
103   Clock
105   Calculator
105   Voice Recorder
107   S Voice
108   Google
108   Voice Search
109   My Files
109   Downloads

# Travel & local

110   Maps
111   Local
112   Latitude
112   Navigation

# Settings

113   About Settings
113   Wi-Fi
114   Bluetooth
114   Data usage
114   More settings
116   Home screen mode
116   Blocking mode
117   Sound
117   Display
118   Storage
119   Power saving mode
119   Battery
119   Application manager
119   Location services
120   Lock screen

SAM-371_00044613

**A830**

Table of Contents

121   Security
122   One-handed operation
122   Language and input
125   Cloud
125   Back up and reset
125   Add account
125   Motion
127   S Pen
127   Accessory
128   Date and time
128   Accessibility
129   Developer options
130   About device

# Troubleshooting

SAM-371_00044614

**A831**

# Getting started

## Device layout



- Notification light
- Earpiece
- Proximity/Light sensor
- Front camera
- Power button
- Touch screen
- Home button
- Menu button
- Microphone
- Back button
- Multipurpose jack
- Microphone for speakerphone
- GPS antenna
- Headset jack
- Rear camera
- Flash
- Volume button
- Back cover
- Speaker
- S Pen
- Main antenna

8

SAM-371_00044615

# EXHIBIT 25



SM-N750

# User Manual

www.samsung.com

SAM-371_00044744

# Table of Contents

## Getting started

8      Device layout
9      Buttons
10     S Pen
10     Package contents
11     Installing the SIM or USIM card and
       battery
14     Charging the battery
16     Inserting a memory card
18     Replacing the S Pen nib
19     Turning the device on and off
20     Holding the device
20     Adjusting the volume
20     Switching to silent mode

## Basics

21     Indicator icons
22     Using the touch screen
26     Control motions
30     Palm motions
31     Using the S Pen
35     Air view
36     Increasing touch screen sensitivity
36     Activating Multi Window
38     Notifications

39     Home screen
43     Locked screen
45     Using applications
46     Applications screen
47     Help
47     One-handed operation
47     Entering text
50     Connecting to a Wi-Fi network
51     Setting up accounts
52     Transferring files
54     Securing the device
55     Upgrading the device

## Communication

56     Phone
62     Contacts
66     Messages
67     Email
69     Google Mail
71     Hangouts
71     Google+
72     Photos
72     ChatON

SAM-371_00044748

**A835**

Table of Contents

## Web & network

| 73 | Internet |
| 74 | Chrome |
| 75 | Bluetooth |
| 76 | Samsung Link |
| 78 | Group Play |
| 80 | NFC |
| 81 | S Beam |

## Media

| 82 | Music |
| 84 | Camera |
| 90 | Gallery |
| 94 | Story Album |
| 95 | Video |
| 96 | YouTube |
| 97 | My Magazine |
| 98 | Flipboard |
| 98 | SketchBook for Galaxy |

## Application & media stores

| 99 | Play Store |
| 100 | Samsung Apps |
| 100 | Play Books |
| 101 | Play Movies & TV |
| 101 | Play Music |
| 101 | Play Games |
| 101 | Play Newsstand |

## Utilities

| 102 | S Note |
| 109 | Action Memo |
| 110 | S Planner |
| 113 | Dropbox |
| 113 | Drive |
| 114 | Cloud |
| 115 | Clock |
| 117 | Calculator |
| 117 | S Translator |
| 118 | Voice Recorder |
| 121 | S Voice |
| 122 | S Finder |
| 122 | Google |
| 123 | Voice Search |
| 124 | Scrapbook |
| 125 | My Files |
| 126 | Downloads |
| 126 | TripAdvisor |
| 126 | Evernote |

## Travel & local

| 127 | Maps |

SAM-371_00044749

**A836**

Table of Contents

# Settings

128  About Settings
128  Connections
132  Device
140  Controls
146  General

# Troubleshooting

SAM-371_00044750

**A837**

# Getting started

## Device layout



SAM-371_00044751

# EXHIBIT 26

# Samsung GALAXY Note® 4

## SMARTPHONE

## User Manual

Please read this manual before operating your device
and keep it for future reference.



**A840**

SAM-371_00044901

# Table of Contents

Getting Started.................................................................1
Front View.....................................................................2
Back View......................................................................3
Assemble Your Device................................................4
Set Up Your Device....................................................7
Set Up Accounts on Your Device........................8

Know Your Device........................................................9
Home Screen..............................................................10
Status Bar....................................................................13
Navigation, Motions, and Gestures.................14
Notification Panel....................................................15
S Pen.............................................................................16
Multi Window............................................................19
Entering Text.............................................................22

Calling.............................................................................24
Making and Answering Calls..............................25

Applications...............................................................28
Apps Screen................................................................29
Google Applications...............................................31
AT&T Applications....................................................33
Other Applications..................................................35
Calculator...................................................................37
Calendar.......................................................................38
Camera and Video...................................................39
Clock..............................................................................41
Contacts.......................................................................42
Email..............................................................................45
GALAXY Apps.............................................................47
Gallery...........................................................................48
Internet.........................................................................50
Messages.....................................................................52

Music Player................................................................54
My Files.........................................................................55
PEN.UP...........................................................................57
S Health........................................................................58
S Note.............................................................................59
S Voice...........................................................................61
Scrapbook....................................................................62
Smart Remote............................................................63
Usage Manager.........................................................64
Video Player................................................................65
Voice Recorder..........................................................66

Settings..........................................................................67
How to Use Settings...............................................68
Wi-Fi and Wi-Fi Direct............................................69
Bluetooth.....................................................................71
Tethering and Wi-Fi Hotspot..............................73
Airplane Mode...........................................................74
Data Usage..................................................................75
Location Services.....................................................76
More Networks..........................................................77
Sharing Files with NFC...........................................78
Nearby Devices.........................................................79
Printing.........................................................................80
Screen Mirroring......................................................81
MirrorLink....................................................................82
Sound Settings.........................................................83
Display Settings........................................................86
Wallpaper Settings.................................................88
Home Screen Settings...........................................89
Lock Screen................................................................90
Multi Window Settings..........................................91
Notification Panel....................................................92

**A841**

SAM-371_00044905

One-Handed Operation.................................................93

Easy Mode.................................................................94

Accessibility..............................................................95

Blocking Mode...........................................................97

Private Mode..............................................................98

Finger Scanner...........................................................99

Motions and Gestures............................................. 100

S Pen ...................................................................... 101

Accounts................................................................. 102

Backup and Reset ................................................... 103

Language and Input Settings.................................... 104

Date and Time Settings ........................................... 107

Safety Assistance ................................................... 108

Accessories............................................................. 109

Battery.................................................................... 110

Power Saving........................................................... 111

Storage................................................................... 112

Security................................................................... 114

Help........................................................................ 116

About Your Device ................................................... 117

Application Manager................................................. 118

Default Applications ................................................. 120

Applications Settings Shortcuts.................................. 121

**A842**

# Getting Started

*Learn about your mobile device hardware, assembly procedures, and how to get started using your new device.*

SAM-371_00044907

# Front View



Earpiece
Proximity and gesture sensors
Status light
Front camera
Volume
Power/Lock key
Recent apps
Home/Finger Scanner key
Back key

- **Back key**: Tap to return to the previous screen, or to close a dialog box, menu, or keyboard.

- **Earpiece**: Listen to a call.

- **Front camera**: Take self-portraits and record videos of yourself.

- **Home/Finger Scanner key**: Tap to return to the Home screen. Activate the Fingerprint security feature.

- **Proximity and gesture sensors**: Detects the presence of objects near the device.

- **Recent apps**: Tap to display recent apps or touch and hold for home screen options.

- **Power/Lock key**: Press and hold to turn the device on or off. Press to lock or wake up the screen. Press and hold to turn the device off or restart it, or for quick access to Airplane Mode, Emergency Mode, and to Mute, Vibrate, and Sound modes.

- **Status Light**: Displays red when charging or the battery is low, blue when a notification has arrived or you are voice recording, and green when fully charged.

- **Volume**: Press to adjust the volume of your device's sounds and audio.

A844

SAM-371_00044908

# Back View



- **Camera**: Take pictures and record videos.

- **Flash**: Illuminate subjects in low-light environments when taking a photo or recording video.

- **Heart rate, SpO$_2$, and UV sensors**: When using the S Health app, these sensors are used to measure your heart rate, SpO$_2$ level (oxygen saturation), and the outdoor UV levels.

- **Headset jack**: Connect an optional headset (not included).

- **Infrared transmitter**: Controls external devices using infrared light.

- **Microphone**: Records audio and detects voice commands.

- **S Pen**: A stylus that assists you in performing various functions.

- **Speaker**: Plays music and other sounds.

- **USB charger/Accessory port**: Connect the Charger/USB cable (included), and other optional accessories (not included).

**A845**

SAM-371_00044909

# EXHIBIT 27

**A846**

Samsung

GALAXY Note® Edge

SMARTPHONE

# User Manual

Please read this manual before operating your device and keep it for future reference.



# Table of Contents

Getting Started ................................................1

Front View ................................................2

Back View ................................................3

Assemble Your Device ................................4

Set Up Your Device ................................7

Set Up Accounts on Your Device ................8

Know Your Device ................................9

Home Screen ................................10

Status Bar ................................13

Edge Screen ................................14

Navigation, Motions, and Gestures ................16

Notification Panel ................................17

Multi Window ................................18

S Pen ................................21

Entering Text ................................25

Calling ................................27

Making and Answering Calls ................28

Applications ................................33

Apps Screen ................................34

Google Applications ................................36

AT&T Applications ................................38

Other Applications ................................40

Calculator ................................42

Calendar ................................43

Camera and Video ................................44

Clock ................................47

Contacts ................................48

Email ................................52

GALAXY Apps ................................53

Gallery ................................54

Internet ................................56

Messages ................................58

Music Player ................................60

My Files ................................61

S Health ................................63

S Note ................................64

S Voice ................................66

Scrapbook ................................67

Video Player ................................68

Voice Recorder ................................69

Settings ................................70

How to Use Settings ................................71

Wi-Fi and Wi-Fi Direct ................................72

Bluetooth ................................74

Tethering and Wi-Fi Hotspot ................................76

Airplane Mode ................................77

Data Usage ................................78

Location Services ................................79

Default Messaging App ................................80

Mobile Networks ................................81

Virtual Private Networks (VPN) ................................82

Sharing Files with NFC ................................83

Nearby Devices ................................84

Printing ................................85

Screen Mirroring ................................86

MirrorLink ................................87

Sound Settings ................................88

Display Settings ................................91

Wallpaper Settings ................................94

Home Screen Settings ................................95

Lock Screen ................................96

Multi Window Settings ................................97

Notification Panel ................................98

A848

SAM-371_00045032

Edge Screen Settings .................................................. 99

One-Handed Operation ............................................ 100

Easy Mode ................................................................. 101

Accessibility .............................................................. 102

Blocking Mode .......................................................... 104

Private Mode ............................................................. 105

Finger Scanner .......................................................... 106

Motions and Gestures .............................................. 107

S Pen .......................................................................... 108

Accounts .................................................................... 109

Backup and Reset ..................................................... 110

Language and Input Settings ................................... 111

Date and Time Settings ........................................... 114

Safety Assistance ..................................................... 115

Accessories ............................................................... 116

Battery ....................................................................... 117

Power Saving ............................................................ 118

Storage ...................................................................... 119

Security ...................................................................... 121

Help ........................................................................... 123

About Your Device .................................................... 124

Application Manager ................................................ 125

Default Applications ................................................. 127

Applications Settings Shortcuts .............................. 128

**A849**

SAM-371_00045033

# Getting Started

*Learn about your mobile device hardware, assembly procedures, and how to get started using your new device.*

SAM-371_00045034

**A850**

# Front View



Headset jack
Earpiece
Proximity and gesture sensors
Power/Lock key
Status light
Front camera
Volume
Edge screen
Recent apps
Home key/Finger Scanner
Back key

- **Back key**: Tap to return to the previous screen, or to close a dialog box, menu, or keyboard.

- **Earpiece**: Listen to a call.

- **Edge screen**: Provides quick access to frequently used apps, alerts, notifications, and device functionality all with the swipe of a thumb.

- **Front camera**: Take self-portraits and record videos of yourself.

- **Headset jack**: Connect an optional headset (not included).

- **Home key**: Tap to return to the Home screen. Activate the Fingerprint security feature.

- **Proximity and gesture sensors**: Detects the presence of objects near the device.

- **Recent apps**: Tap to display recent apps or touch and hold for home screen options.

- **Power/Lock key**: Press and hold to turn the device on or off. Press to lock or wake up the screen. Press and hold to turn the device off or restart it, or for quick access to Airplane Mode, Emergency Mode, and to Mute, Vibrate, and Sound modes.

- **Status Light**: Displays red when charging or the battery is low, blue when a notification has arrived or you are voice recording, and green when fully charged.

- **Volume**: Press to adjust the volume of your device's sounds and audio.

**A851**

SAM-371_00045035

# Back View



Microphone
Infrared transmitter
Camera
Flash
Heart rate sensor
Temperature and humidity sensor
Speaker
S Pen
Microphone
Microphone
USB charger/Accessory port

- **Camera**: Take pictures and record videos.

- **Flash**: Illuminate subjects in low-light environments when taking a photo or recording video.

- **Heart Rate Sensor**: When using the S Health app, this sensor measures your heart rate via your fingertip.

- **Infrared transmitter**: Controls external devices using infrared light.

- **Microphone**: Records audio and detects voice commands.

- **S Pen**: A stylus that assists you in performing various functions.

- **Speaker**: Plays music and other sounds.

- **Temperature and humidity sensor**: Monitors both temperature and humidity conditions. This is used to calculate calories burned within S Health.

- **USB charger/Accessory port**: Connect the Charger/USB cable (included), and other optional accessories (not included).

SAM-371_00045036

**A852**

# EXHIBIT 28

# Samsung GALAXY S⁵

### 4G  LTE  SMARTPHONE

## User Manual

Please read this manual before operating your
phone, and keep it for future reference.



SAM-371_00046662

**A854**

## Table of Contents

**Section 1: Getting Started .............................4**
Setting Up Your Phone . . . . . . . . . . . . . . . . . . . . . . 4
Charging the Battery . . . . . . . . . . . . . . . . . . . . . . . . 7
Maintaining water and dust resistance  . . . . . . . . 10
Extending Your Battery Life  . . . . . . . . . . . . . . . . . 11
Switching the Device On or Off  . . . . . . . . . . . . . . 12
Locking and Unlocking the Touch Screen  . . . . . . 12
Configuring your Phone . . . . . . . . . . . . . . . . . . . . . 13
Creating a Samsung Account  . . . . . . . . . . . . . . . . 13
Setting Up Your Voice Mail  . . . . . . . . . . . . . . . . . 14

**Section 2: Understanding Your Phone .........15**
Features of Your Phone . . . . . . . . . . . . . . . . . . . . . 15
Front View . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Back View . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Status Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Menu Navigation . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Using the Multi Window . . . . . . . . . . . . . . . . . . . . 26
Customizing Your Home Screen  . . . . . . . . . . . . . 31
Notification Panel  . . . . . . . . . . . . . . . . . . . . . . . . . 38
Entering Text . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Using Google Voice Typing  . . . . . . . . . . . . . . . . . 40
Using the Samsung Keyboard . . . . . . . . . . . . . . . 40
Entering Text Using Swype . . . . . . . . . . . . . . . . . 44

**Section 3: Call Functions  ...........................46**
Displaying Your Phone Number  . . . . . . . . . . . . . . 46
Making a Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Ending a Call  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Answering a Call  . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Making Emergency Calls  . . . . . . . . . . . . . . . . . . . 49
Making a Call Using Speed Dial  . . . . . . . . . . . . . 50
Dialing Options . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Call Log  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Call Duration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Options During a Call  . . . . . . . . . . . . . . . . . . . . . . 53
Call Settings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**Section 4: Contacts  ....................................59**
Adding a New Contact  . . . . . . . . . . . . . . . . . . . . . 59
Editing an Existing Contact . . . . . . . . . . . . . . . . . 61
Using Contacts . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
Linking Contacts  . . . . . . . . . . . . . . . . . . . . . . . . . . 62

1

SAM-371_00046670

**A855**

Synchronizing Accounts . . . . . . . . . . . . . . . . . . . . 64
Contacts List Options . . . . . . . . . . . . . . . . . . . . . . 64
Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Contacts List Favorites . . . . . . . . . . . . . . . . . . . . . 67
Deleting Contacts List Entries from the Phone . . 68
**Section 5:  Messaging** ................................... **69**
Types of Messages . . . . . . . . . . . . . . . . . . . . . . . . 69
Creating and Sending Messages . . . . . . . . . . . . 70
Message Options . . . . . . . . . . . . . . . . . . . . . . . . . 71
Viewing New Received Messages . . . . . . . . . . . 73
Deleting Messages . . . . . . . . . . . . . . . . . . . . . . . . 74
Message Search . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Messaging Settings . . . . . . . . . . . . . . . . . . . . . . . 75
**Section 6:  Connections** ............................... **78**
PC Connections . . . . . . . . . . . . . . . . . . . . . . . . . . 78
Wi-Fi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
NFC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
Bluetooth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
**Section 7:  Applications** ............................... **88**
Calculator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
Calendar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Camera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
ChatON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Chrome . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
Clock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
Contacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
Drive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
Email . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
Flipboard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
Gallery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
Gmail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
Google . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
Google Settings . . . . . . . . . . . . . . . . . . . . . . . . . 108
Google + . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
Hangouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
Internet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
Maps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
Messaging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
Music . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
My Cricket . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
My Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Phone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Photos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Play Books . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Play Games . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

2

SAM-371_00046671

**A856**

Play Movies & TV  . . . . . . . . . . . . . . . . . . . . . . . 118
Play Music  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
Play Newsstand  . . . . . . . . . . . . . . . . . . . . . . . . 118
Play Store  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
POLARIS Office 5 . . . . . . . . . . . . . . . . . . . . . . . . 119
S Health  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
S Voice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
Samsung Apps  . . . . . . . . . . . . . . . . . . . . . . . . . 122
Settings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
Smart Remote . . . . . . . . . . . . . . . . . . . . . . . . . 122
Video . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
Voice Recorder  . . . . . . . . . . . . . . . . . . . . . . . . 128
Voice Search . . . . . . . . . . . . . . . . . . . . . . . . . . 128
Voicemail  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
Wi-Fi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
YouTube . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
Section 8:  Changing Your Settings ............130
Accessing Settings  . . . . . . . . . . . . . . . . . . . . . 130
Quick Settings . . . . . . . . . . . . . . . . . . . . . . . . . 131
Connections  . . . . . . . . . . . . . . . . . . . . . . . . . . 132
Connect and Share  . . . . . . . . . . . . . . . . . . . . . 137
Sound and Display  . . . . . . . . . . . . . . . . . . . . . 139
Personalization  . . . . . . . . . . . . . . . . . . . . . . . . 147

Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .152
User and Backup  . . . . . . . . . . . . . . . . . . . . . . .154
System Settings . . . . . . . . . . . . . . . . . . . . . . . .156
Application Settings  . . . . . . . . . . . . . . . . . . . . .171
Section 9:  Samsung Product
   Registration  ............................................. 185
Index .......................................................... 186

3

SAM-371_00046672

**A857**

## Front View



1. **Indicator light** illuminates with a series of distinct colors and flashing patterns to indicate different notifications and statuses. Events include Charging, Low battery, and Missed event:
   - Powering on and Missed Notification (Call or Messaging)- **blue** blinks
   - Battery Charging - **red** remains on
   - Low Battery or Charging Error- **red** blinks
   - Battery Fully Charged - **green** remains on

2. **Light (RGB) Sensor** lets you use the ambient light level to adjust the screen brightness/contrast. This sensor decreases screen brightness in dim light.
   - In a bright light condition (outdoors), the sensors cause the device to increase the brightness and contrast for better viewing.
   - In dim light conditions, the device decreases the screen brightness to compensate.

3. **Volume key** allows you to adjust the ringer volume in standby mode (with the phone open) or adjust the voice volume during a call. When receiving an incoming call:
   - Pressing the volume key down mutes the ring tone.

16

SAM-371_00046685

**A858**

4. **Application icons** are shortcuts to your favorite applications on the Home screen.

5. **Recent key** displays a list of recently opened apps and provides access to the Task Manager.

6. **Home key** displays the Home screen when pressed. Press and hold to display Google Search. Double-press to activate S Voice.

7. **Microphone - bottom** is used during phone calls and allow other callers to hear you clearly when you are speaking to them.

8. **USB Power/Accessory connector** allows you to connect a power cable or optional accessories such as a USB/data cable.

9. **Back key** re-displays the previous screen or clears entries.

10. **Primary Shortcuts** allow quick access to important features such as Phone, Contacts, Messaging, Internet, and Apps.

11. **Home screen indicator** shows which Home screen is presently displayed.

12. **Google Quick Search bar** provides a shortcut to Google Search that allows you to search for items on the internet.

13. **Widgets** are self-contained onscreen applications (not shortcuts). These can be placed onto any of the available screens (Home or extended).

SAM-371_00046686

**A859**

14. **Power/End key** ⬭ ⏻ ends a call or switches the phone off and on. Press and hold for two seconds to:
   - Access the audio modes for the device. Tap an onscreen selection (Mute, Vibrate, or Sound).
   - Turn the device On or Off ⏻
   - Enable Airplane mode ✈
   - Restart the device ↻
   - Enable Emergency mode ◣

15. **Status bar** shows the information needed to operate your phone, such as the received signal strength, phone battery level, time, unread Emails, missed calls, etc.

16. **Front Facing Camera** allows you to take pictures while facing the screen and allows you to video conference.

17. **Gestures Sensor** used to detect Air View and Air Gesture motions.

18. **Proximity Sensor** detects how close an object is to the surface of the screen. This is typically used to detect when your face is pressed up against the screen, such as during a phone call.
   - While talking on the phone, the sensor detects talk activity and locks the keypad to prevent accidental key presses.

19. **Receiver** allows you to hear the other caller.

20. **Microphone - top** used while an active call is in the speakerphone mode and assists in noise cancellation (2 microphone solution).

18

SAM-371_00046687

**A860**

**Back View**



1. **Camera lens** is used to take photos.
2. **Flash is used to take photos in low-light conditions.**
3. **Heart Rate Sensors,** when using the S Health app, these sensors measure your heart rate via your fingertip. For information on the S Health app, see *"S Health"* on page 120.
4. **External speaker** allows you to hear ringers, music, and other sounds offered by your phone.
5. **Headset jack** allows you to connect a hands-free headset so you can listen to music.
6. **Temperature and Humidty sensor** allows your device to read both temperature and humidity conditions. This is useful to calculate calories burned within S Health.
7. **IR Transmitter** used to emit infrared signals used for controlling external devices. For more information, refer to *"Smart Remote"* on page 122.

Understanding Your Phone      19

SAM-371_00046688

**A861**

# EXHIBIT 29
# Redacted in Its Entirety

# EXHIBIT 30

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IMPERIUM IP HOLDINGS (CAYMAN) :   DOCKET NO. 4:14CV371
                                 :
VS.              :   SHERMAN, TEXAS
                 :   FEBRUARY 2, 2016
SAMSUNG ELECTRONICS CO.   :   MORNING SESSION

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE AMOS L. MAZZANT,
UNITED STATES DISTRICT JUDGE, AND A JURY

APPEARANCES:

FOR THE PLAINTIFF:    MR. ALAN MICHAEL FISCH
    MR. ROY WILLIAM SIGLER
    MR. JEFFREY SALTMAN
    MR. JOHN T. BATTAGLIA
    FISCH SIGLER
    5301 WISCONSIN AVENUE NW
    FOURTH FLOOR
    WASHINGTON, DC 20015
    MR. DAVID MICHAEL SAUNDERS
    MR. S. DESMOND JUI
    MR. SRULI YELLIN
    FISCH SIGLER
    96 N. THIRD STREET, SUITE 260
    SAN JOSE, CA 95112

    MS. SILVIA JORDAN
    FISCH SIGLER
    505 EIGHTH AVE, 12TH FLOOR
    NEW YORK, NY 10018

FOR THE DEFENDANT:    MR. JESSE J. JENNER
    MR. CHRISTOPHER JOHN HARNETT
    MR. STEVEN PEPE
    MR. KEVIN JOHN POST
    MR. ALEXANDER ERNEST MIDDLETON
    ROPES & GRAY
    1211 AVENUE OF THE AMERICAS
    NEW YORK, NY 10036

Page 2

1           MR. SAMUEL LAWRENCE BRENNER
            MR. SCOTT STEPHEN TAYLOR
2           ROPES & GRAY
            PRUDENTIAL TOWER
3           800 BOYLSTON STREET
            BOSTON, MA 02199
4
            MS. REBECCA R. CARRIZOSA
5           ROPES & GRAY
            1900 UNIVERSITY AVE 6TH FLOOR
6           EAST PALO ALTO, CA 94303
7           MR. CLYDE MOODY SIEBMAN
            MR. LARRY PHILLIPS
8           SIEBMAN BURG PHILLIPS & SMITH
            300 N. TRAVIS
9           SHERMAN, TX 75090
10
11  COURT REPORTER:        MS. JUDITH WERLINGER
            DEPUTY OFFICIAL REPORTER
12          101 E. PECAN #110
            SHERMAN, TEXAS 75090
13
14
15
16
17
18
19
20
21
22
23
24  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

Page 3

1           (Jury out.)
2           THE COURT: Good morning. Be seated.
3       Now, did y'all discuss issues regarding time, the issue
4   we brought up? Have y'all come to some kind of agreement on
5   that issue?
6           MR. FISCH: A partial agreement, an agreement to
7   split the remaining time, Your Honor, but the disagreement is
8   about how much time may actually be remaining.
9       As Your Honor knows from the final pretrial conference,
10  it was always my view that this could be done in five days
11  and we would go to close Friday morning.
12      I understand that Samsung would like additional time.
13  I'm fine going to Monday for the close, but what I'd rather
14  not do is extend the trial day. As Your Honor knows, this
15  is dense material, even by patent law standards, and
16  grinding our jurors out for another 90 minutes isn't going
17  to make them any better at making the decision, and it's
18  certainly not going to ingratiate them to anyone here.
19          THE COURT: Mr. Siebman?
20          MR. SIEBMAN: Yes, Your Honor. We -- we looked very,
21  very carefully at our case last night, and we think that we
22  need 16 hours in order to -- to put our case on.
23      The Plaintiff, as -- as they have the right to do, I
24  suppose, has -- has started removing a lot of material that
25  we were planning on -- for example, as the Court noticed

Page 4

1   yesterday at the end of the day, we discussed that issue, so
2   we're having to put some of that material back on in order
3   to -- to put other things in context.
4       So there's a lot of moving pieces that we're -- that
5   we're reacting to. They're taking people off their witness
6   list that we had planned to -- that we thought were
7   going to put on and we were going to cross, but we're now
8   going to have to -- figure out how to address that to --
9   to put that in context with the cross.
10      And so not only do we need that time, but, you know,
11  we're being challenged -- we really need more time, but we
12  understand the Court doesn't have more time. But we don't
13  think we can get below -- we think we need 16 hours.
14          THE COURT: Okay. So what are you proposing?
15          MR. SIEBMAN: I think --
16          MR. FISCH: I'm sorry. I didn't know who the
17  question was directed to.
18          THE COURT: I will give you both a chance, but --
19          MR. SIEBMAN: If we go to 6 o'clock for trial days, I
20  think -- I think we can get there and get it done by Monday.
21          THE COURT: Okay.
22          MR. SIEBMAN: Or -- or alternatively, if the
23  Plaintiff only needs 12 hours for their case, you know, we
24  might could figure out how -- if they use 12 hours, we might --
25  if we need 16 and they need I haven't done the math on it.

Page 81

1  QUESTION:  And LP mode is single-ended mode, right?
2  ANSWER:  Yes.
3  QUESTION:  So D-PHY can be operated in single-ended
4  mode, differential mode, right, sir?
5  ANSWER:  Yes.
6  (End of video clip.)
7  THE COURT:  Okay.  Does that conclude that
8  deposition?
9  Would you like to call your next witness?
10  MR. FISCH:  Thank you, Your Honor.
11  We'd like to call Dr. Cameron Wright, please.
12  THE COURT:  Sir, would you raise your right hand and
13  be sworn in.
14  (Witness sworn.)
15  THE COURT:  Go ahead.
16  MR. FISCH:  Thank you, Your Honor.
17  CAMERON WRIGHT, Ph.D., PLAINTIFF'S WITNESS, SWORN
18  DIRECT EXAMINATION
19  BY MR. FISCH:
20  Q.  Good morning, Dr. Wright.
21  A.  Good morning, sir.
22  Q.  Could you please introduce yourself to the jury?
23  A.  Yes, sir.  I'm Dr. Cameron Wright.
24  Q.  And, Dr. Wright, I understand you've prepared some
25  materials for your testimony today, is that correct?

Page 82

1  A.  Yes, sir, I have.
2  Q.  And they are, I understand, slides; is that accurate?
3  A.  Yes, sir.
4  MR. FISCH:  Mr. Rennick, could you please put up the
5  slides?  Thank you.
6  Q.  (By Mr. Fisch) I see the first one is education.  Could
7  you tell us a little bit about your education, Dr. Wright?
8  A.  Yes, sir.  I didn't take a direct path.  I enlisted in
9  the Navy at 17 years old and had -- stationed around the
10  world, various assignments, and by the time -- after about
11  six years, I was an E-6, and I transferred from active duty
12  over to the reserves so that I could use the GI Bill to pay
13  for college.
14  And then I obtained my Bachelor's Degree in electrical
15  engineering from Louisiana Tech University in 1983.
16  I then accepted a commission as an officer in the U.S.
17  Air Force and had several assignments before I was then
18  selected for an Air Force-wide scholarship to obtain my
19  Master's Degree in electrical engineering, which I obtained
20  from Purdue University in 1988.
21  Then I had more assignments in the Air Force, and I was
22  then selected for another Air Force-wide scholarship to
23  obtain my Ph.D. in electrical engineering, which I obtained
24  from the University of Texas at Austin in 1996.
25  Q.  Very impressive, Doctor.  Thank you.

Page 83

1  Could you share some of your experiences with us as
2  well?
3  A.  Yes, sir.  You see on the screen I've spent -- I spent
4  many years as a research and development engineer in the Air
5  Force working on a variety of projects, some -- some
6  classified.
7  My roles ranged from design engineer, lead engineer,
8  chief engineer, but what's important to this discussion here
9  is it involved technologies that included various types of
10  interfaces and computers and cameras and imaging and so
11  forth.
12  After a number of assignments in that role, I was
13  selected to be a professor of electrical engineering at the
14  Air Force Academy where I taught classes to the cadets.
15  That, again, included topics including interfaces and
16  cameras and imaging systems and lighting and things of that
17  nature.
18  And after a time there at the Air Force Academy, I was
19  recruited by the University of Wyoming, and I've been there
20  at the faculty at the University of Wyoming for about
21  13 years, teaching both undergraduate and graduate courses
22  that include topics of interfaces, computers, imaging,
23  lighting, things like that, and doing research in these
24  areas as well.
25  And while I've been an engineer for approximately

Page 84

1  33 years, sir, after I had the minimum required work
2  experience, I did sit for the national exam for licensing,
3  and I've been a licensed professional engineer for 26 years.
4  Q.  Thank you, Doctor.
5  Sir, do you have an opinion in this case?
6  A.  Yes, sir, I do.
7  Q.  What is it, sir?
8  A.  Sir, my opinion is that Samsung infringes Imperium's
9  patents.
10  Q.  Which ones, sir?
11  A.  The interface patent, the preflash patent and the
12  anti-flicker patent.
13  Q.  And how did you reach that conclusion, Doctor?
14  A.  Sir, I investigated Samsung's own responses to
15  Imperium's questions, and they answered the questions.  I
16  went through all of Samsung's documentation that they
17  supplied.  I looked at depositions.  I looked at source
18  code.  I looked at a large body of evidence to come to this
19  conclusion.
20  Q.  How long have you been working on this case, Doctor?
21  A.  Sir, I've been working on this case for over a year.  I
22  have put in over 500, 600 hours on this case.
23  Q.  Did you write a report for this case?
24  A.  Yes, sir, I produced a report.
25  Q.  How long?

Page 85

1   A.  Well, sir, the main body of the report, which summarizes
2   all of the conclusions, is 154 pages long.  All of the
3   attachments, product after product after product with lots
4   of repetition and lots of blank space, that actually bumps
5   it up to over 20,000 -- over 30,000 pages.  It's rather
6   large and voluminous, but lots of blank space, lots of
7   repetition, which if you would take away all that
8   repetition, it would only be a few hundred pages.
9   Q.  In preparing your report, did you use Judge Mazzant's
10   definitions of the patents in this case?
11   A.  Yes, sir.  I applied the claims construction from the
12   Court when I went through all of these documents.
13   Q.  Are those the same constructions that are found in the
14   juror binders?
15   A.  Yes, sir, they are identical to the constructions there.
16   Q.  So you've undertaken an analysis.  Where would you like
17   to begin sharing it with us, Doctor?
18   A.  Well, sir, I'd like to talk about the interface patent.
19   And so the interface patent solves the problem of
20   interfaces.
21   Q.  What's an interface, Doctor?
22   A.  Well, in its most basic terms, an interface is a way for
23   two devices or two components to talk to each other.  And it
24   really requires two things.  It requires both a connection
25   between the two devices, but it also requires some agreement

Page 86

1   in how they're going to communicate.
2       So if I were to place a phone call down to Mexico, for
3   example, I might have the connection, but I would have to
4   agree with the person at the other end that we're going to
5   speak English, we're going to speak Spanish, and that
6   agreement, in engineer speak, is often called a protocol.
7   So you need both a protocol and the connection together.
8       And you've seen in the -- in the video testimony
9   talking about a CSI-2 and a D-PHY, that's the protocol and
10   the connection that makes up an interface.
11   Q.  What types of interfaces are there, Doctor?
12   A.  Well, there are many different types, but for the
13   purposes of this patent, we're talking about two different
14   types of interface called a single-ended interface and a
15   differential interface.
16   Q.  And what are those drawings on the screen, sir?
17   A.  Sir, those drawings come from the patent itself.
18   Q.  What else can you share with us about the interfaces?
19   A.  Well, sir, there are certain advantages and
20   disadvantages to the single-ended or the differential as
21   they're employed.
22       The single-ended interface, while it can only transmit
23   data relatively slowly, it doesn't take much battery power
24   to do that.
25       On the other hand, the differential interface can

Page 87

1   transmit data very quickly, but it takes quite a bit of
2   battery power to do that.
3   Q.  So what does this patent speak to then, Doctor?
4   A.  Well, sir, the patent solves the problem that was a
5   dilemma for designers in that before this patent, a designer
6   had to make a choice, single-ended or differential, and then
7   live with the consequences.
8       And this patent describes a way that you can combine
9   the two into a single interface where you can select back
10   and forth between the single-ended or the differential when
11   you need it.  And so you don't have to waste battery power
12   when you don't need to, but when you need to transmit data
13   very quickly, you can.
14   Q.  And what about Samsung's products as it relates to the
15   patents specifically, Doctor?
16   A.  Well, sir, Samsung infringes the interface patent.
17   Q.  With what types of products, sir?
18   A.  Sir, it infringes with phones, with computers, and with
19   tablets.
20   Q.  Could you walk us through which phones infringe, Doctor?
21   A.  Yes, sir.  So here on the screen I show 16 different
22   phones that infringe Imperium's interface patent.
23       For computers, there are two models of computers there
24   I found that infringe Samsung's -- infringe Imperium's
25   patent.

Page 88

1       And for tablets, there are five models of tablets that
2   infringe Imperium's interface patent.
3   Q.  Thank you, Doctor.  Where would you like to take us
4   next?
5   A.  Well, sir, these are a lot of models here, a lot of
6   individual models.  We can't walk through every one, so I've
7   chosen as one example product, one representative, and since
8   they all infringe in the same way, I can -- I can walk
9   through that product and you can apply it to the others.  So
10   I'd like to discuss the Samsung S5.
11   Q.  Why the S5, Doctor?
12   A.  Well, again, it infringes in the same way.  The same
13   interface is employed in all of these devices, and it
14   infringes in basically the same way.
15   Q.  So you could have selected one -- any of them?
16   A.  Any of them, sir.
17   Q.  But you selected the S5?
18   A.  Yes, sir.  They all infringe the same way.
19   Q.  So would you like to begin the analysis, Doctor?
20   A.  Yes, sir.
21   Q.  Would you take us through it, please?
22   A.  Well, what I'm showing here on the screen, sir, is Claim
23   10 from the patent.  So if you look at the patents -- and
24   here I have written up here at the top "interface," and if
25   you turn to the very back and on Column 5 here I've marked

A885

Page 97

1  sends a signal saying, okay, I'm finished.  And then it
2  drops back to -- single-ended mode.  And so these
3  communication or control signals are also sent.
4  Q.  So what is your conclusion about this element, then,
5  Doctor?
6  A.  Sir, I find that this -- this element is also met, and I
7  can check this box.
8  Q.  And, again, to touch on this -- we touched on it just a
9  moment ago lightly, but I'll follow up.
10     Once again, what kind of data has to be transmitted by
11  the interface this time?
12  A.  Sir, it can transmit image data, but it doesn't have to
13  just transmit image data.  It also can transmit the control
14  signal information as well.  It has to be able to talk back
15  and forth.
16  Q.  So, Doctor, we've now just walked together through all
17  of Claim 10 of the interface patent.  With respect to the
18  Samsung S5, what is your conclusion?
19  A.  Sir, I conclude that it infringes the interface patent.
20  Q.  Now, Doctor, you mentioned that there were a number of
21  products at the very beginning of your discussion of this
22  patent.
23  A.  Yes, sir.
24  Q.  How does this one finding of infringement on the S5
25  relate to all the other products you showed?

Page 98

1  A.  Well, the method of infringement is the same.  I looked
2  at all these documentation sources, mostly from Samsung,
3  some from the third-party vendors like Qualcomm, other --
4  other companies from chips that they use.  I looked at the
5  deposition of Donguk Park, which you saw some of just a
6  minute ago.  I looked at all this documentation as it -- as
7  it applies to the phones, each of the phone models, and
8  found that each of the phone models that I listed earlier on
9  the screen infringe the interface patent.
10  Q.  And which phones, in particular, do you conclude
11  infringe the interface patent?
12  A.  These -- these 16 models shown on the screen infringe
13  the interface patent.
14  Q.  Now, you looked at other products, too, correct, Doctor?
15  A.  Yes, sir.  For the computers, I looked at another set of
16  documents that related to those products.  Again, lots of
17  Samsung documents, Samsung's own interrogatory responses --
18  that's the answer to questions that -- that Imperium
19  asked -- the MIPI documentation, depositions from Samsung
20  engineers, and all together they led me to the conclusion
21  that -- that there were models of computers that infringe
22  the interface patent, in particular, these two models that I
23  show on the screen here.
24  Q.  And what about the tablets, Doctor?  You indicated at
25  the start that some tablets infringe.  What are your

Page 99

1  conclusions about the tablets?
2  A.  Yes, sir.  Again, I would go to the documentation
3  associated with those products, and it includes Samsung's
4  own responses, Samsung's own datasheets and manuals, the
5  MIPI specification, deposition of Samsung engineers.
6     All of this together again brings me to the conclusion
7  that there are models of tablets that infringe the interface
8  patent; in particular, these five models that you see on the
9  screen.
10  Q.  So, Doctor, now that we've gone through the analysis
11  that you've just shared with us about the interface patent,
12  do you have an ultimate conclusion regarding the interface
13  patent?
14  A.  Yes, sir.  After looking at all the evidence and
15  inspecting each individual product, I find that the -- that
16  Samsung is infringing the interface patent.
17  Q.  Doctor, I understand you've analyzed the other two
18  patents as well.
19  A.  Yes, sir.
20  Q.  Where would you like to take us next?
21  A.  So I'd like to talk about the preflash patent.
22  Q.  What should we know about the preflash patent, Doctor?
23  A.  Well, the preflash patent tries to obtain the right
24  amount of lighting when you're taking a picture.
25     If you don't have enough light when you take a picture,

Page 100

1  of course, your picture's going to be dark or underexposed.
2  If it puts out too much light when it's taking a picture,
3  your -- your -- your picture will be too bright, washed out,
4  and what we call overexposed.
5     But if it puts out just the right amount of light, then
6  you'll have a well-exposed picture.  And --
7  Q.  So how is that achieved, Doctor?
8  A.  So with the preflash patent, it basically tries to send
9  out a little bit of light ahead of time.
10     I mean, in the old days that wasn't how you did it,
11  though.  In the old days you actually had to measure the
12  light yourself; for example, with a -- with a handheld light
13  meter similar to what I'm showing you on the screen.  So you
14  had to actually manually measure the light, and once that
15  told you how much light there was, you had to set -- you
16  know, turn little knobs on the camera, set it the way you
17  wanted to.  You then had to point the camera, take the
18  picture, press the shutter button, and actually capture the
19  image.
20     Now, that was somewhat tedious.  Modern cameras don't
21  do it like that.  They have these automatic modes.  And in
22  automatic mode, what happens is, as you press the button to
23  take the picture, all sorts of things happen really fast,
24  the blink of an eye.
25     The camera itself will go and measure how much light is

Page 101

1    out there.  The camera itself will set its own settings for
2    you.  And then once the settings are correct, it will
3    actually take the picture.  And that's how the modern camera
4    does when you take a picture with your cell phone or a
5    camera today.
6    Q.  Now, Doctor, yesterday I drew an example of that on a
7    board.  Do you have an example to share as well?
8    A.  Yes, sir.  So if you wanted to take a picture of, let's
9    say, this bowl of fruit, and so you have your camera here,
10   you press the button, and one of the first things that the
11   camera will do is send out this initial little amount of
12   light called a preflash.
13        And so the preflash comes out, the light goes out,
14   strikes the object you're trying to take a picture of,
15   bounces back and is obtained by the sensor where it gets a
16   little -- what's called a preparatory image.  It's sort of a
17   pre-image that it's looking at saying, you know, how much
18   light am I going to need for the main flash.
19        And so it then determines from that all the settings
20   that it needs for the main flash and other settings for the
21   camera, and it sets all of those automatically.  And then
22   the picture is actually taken.
23   Q.  How fast does all that happen, Doctor?  This took a few
24   seconds on the screen.
25   A.  Sir, it's in less than a blink of an eye.  It's the time

Page 102

1    that you press the button, and you hear the click, and you
2    see the image.  It's all happened that fast.
3    Q.  So, Doctor, which Samsung products infringe the preflash
4    patent?
5    A.  Well, sir, for the preflash patent, when I looked at all
6    of the -- all of the products and documentation, I found
7    that there were phones and there were cameras that infringed
8    the preflash patent.
9    Q.  Which phones in particular did you find, Doctor?
10   A.  Well, specifically, I'm showing on the screen here
11   15 models of phones that infringe the preflash patent.
12   Q.  And you've looked at all of these phones?
13   A.  Yes, sir.  I looked at them individually with the
14   documentation.
15   Q.  Did you have actual physical specimens of each phone?
16   A.  No, sir.  I didn't require a physical specimen of each
17   of these models.  I had Samsung's own documentation that
18   relates to each of these models.
19   Q.  What about the cameras, Doctor?  You mentioned that
20   there are cameras infringing as well.
21   A.  Yes, sir.  When I looked at the different camera models,
22   I found 52 models of cameras that infringed the preflash
23   patent.
24   Q.  I'll ask the same question about the cameras.  Do you
25   have 52 cameras at home?

Page 103

1    A.  No, sir, I don't.  I don't have to open it up.  In
2    today's technology, if you -- if you buy, let's say, your
3    cell phone and you were to take the cover off and look
4    inside it, what you'll see is a bunch of chips.  That
5    doesn't tell you anything.
6        What tells you things is the documentation by the
7    person that designed and manufactured that device.  And so I
8    turned to the documentation that describes how they designed
9    it, how they work, what the functionality is.  Just staring
10   at the inside of a device wouldn't help me at all.
11   Q.  So, Doctor, how would you like to begin your analysis of
12   this patent?
13   A.  Well, sir, I'd like to talk about the fact that when I
14   investigated the preflash methods that Samsung used, I found
15   that there are actually three different algorithms that they
16   use.
17        So in algorithm one I'm showing here on the screen,
18   it's called the Strobo algorithm.  It's the oldest.
19        The next one is called the Flash aE algorithm, and it
20   was the next one in the time progression.
21        And then the third one here is just called Flash
22   algorithm, and that's the -- that's the latest one.
23        And so it depends on which model, which product you're
24   looking at which algorithm it uses.  But, of course, they do
25   very basically the same thing.  They're just follow-ons to

Page 104

1    each other.
2    Q.  Where would you like to begin your analysis here,
3    Doctor?
4    A.  Well, sir, as I go through and show, I have to show this
5    for each algorithm.  So for algorithm one, I've chosen a
6    particular example of a representative product, in this case
7    one of the cameras, a WB2100.
8    Q.  And just so I understand, Doctor, there are three
9    algorithms, and to prove infringement across the board,
10   you're going to have to walk us through the claim elements
11   for each of the three algorithms?
12   A.  Yes, sir.
13   Q.  Understood.  So let's start with the first one then.  A
14   representative product you identified, just to clarify, is a
15   camera?
16   A.  Yes, sir.  A WB2100 is a digital camera by Samsung.
17        And so here I'm showing on the screen the exact wording
18   for Claim 1.  And, again, from -- from the preflash patent,
19   you turn back to the -- turn to the back of the document.
20   It's not quite at the very back.  It's about three pages
21   from the back -- two pages from the back where you can see
22   where Claim 1 is on Column 11.
23        And what I'm showing here on the screen is exactly the
24   same words from the patent that you see on the screen.
25   Q.  So, Doctor, could you take us through beginning with

26 (Pages 101 to 104)

Page 105

1   Element 1, please?
2   A. Yes, sir. So the first element says: A method of
3   adjusting image lighting, the method comprising.
4       So I have to look into the documentation to see if this
5   particular product can adjust image lighting. So if I go to
6   the manual for this product -- and you see WB2100 -- but go
7   into this document, you can see that it has a flash. So it
8   does have a method to adjust image lighting. So I can place
9   a checkmark in that box.
10  Q. What did you learn about the second element, Doctor?
11  A. This element says: Generating a preparatory light for a
12  predetermined preparatory duration.
13      So this means that preflash -- it wants to fire a
14  preflash for an amount of time known ahead of time. Because
15  you have to know how much time you have a light on to -- and
16  how bright it is to know how much light you're gathering.
17      So, again, I turned to the documentation, and in this
18  documentation -- this is from the documentation of the
19  Strobo algorithm, which is used for this camera. I can look
20  at some of the values that are set here, and here it's
21  talking about the pre-duration, which is the duration time
22  of the preflash or the preparatory light.
23      And so it does generate a preparatory light for a
24  predetermined preparatory duration.
25  Q. What did that teach you, Doctor?

Page 106

1   A. I can place a check in that box, sir.
2   Q. What about the next element? What did you learn about
3   the next element of Claim 1, Doctor?
4   A. Well, sir, the next element of the claim talks about
5   capturing a preparatory image while generating the
6   preparatory light, wherein the preparatory image is
7   represented by preparatory image data.
8       So sort of to decode that a little bit, you use the
9   preflash and it's -- this element is saying it took sort of
10  a practice image. You can think of it as a practice image
11  it's going to use to get the information it needs to set the
12  main flash.
13      And so I have to determine: Was this preparatory image
14  taken, and is it represented by the preparatory image data?
15      So, again, I turn again to the documentation, and you
16  can see here again documentation from the Strobo algorithm
17  where it's showing how it's collecting patch data during
18  preflash.
19      Well, "patch" is the term used in this document to talk
20  about regions of the image that it took. So it's going to
21  get data from the different regions of this preparatory image
22  that it took, and it's going to use it later in order to
23  figure out the preflash.
24      But this tells me that it did capture a preparatory
25  image while generating the preparatory light and that the

Page 107

1   preparatory image is represented by preparatory image data.
2   Q. And that taught you what then, Doctor?
3   A. Again, that this element is satisfied, and I can place a
4   checkmark in this box.
5   Q. And what did you learn about the next element, the
6   fourth element of Claim 1?
7   A. Well, sir, this element says: Determining an average
8   preparatory image luminance of the preparatory image based
9   on the preparatory image data and weighting at least a
10  subset of the preparatory image data.
11      So luminance is brightness, basically. So it's talking
12  about determining the brightness of that preparatory image
13  that it took, that little -- that little pre-image that it
14  took. And then it's got to weight some parts of that image
15  so that it can decide better how to set the main flash.
16      And so --
17  Q. Doctor, yesterday I talked -- when I was up at the
18  easel, I talked about chopping up the image.
19  A. Yes.
20  Q. Is that what we're talking about here?
21  A. Yes, sir. It chops it up into these regions, and these
22  regions are what they refer to in the document as these
23  patches, and they're going to apply different weights to
24  these patches to come up with an idea of how much they're
25  going to need for the main flash.

Page 108

1   Q. So what did you learn about this element, Doctor?
2   A. Well, sir, if I go into the documentation -- again, this
3   is from the Strobo algorithm -- and I can look here, and I
4   can see that it's determining the target luminance of
5   capture. So this is the captured image, and this target
6   luminance is basically what it's going to try to achieve.
7       And so when I turn further there, here's a -- here's an
8   excerpt again from the Strobo algorithm document where it's
9   talking about the different patches. You can see underlined
10  it's using a weighted average.
11      And so these weighted averages are from these different
12  regions of this image that it took and so that it is
13  determining an average preparatory image luminance of the
14  preparatory image based on the preparatory image data and
15  weighting at least a subset of the preparatory image data.
16      So, again, I find that that element is satisfied, and I
17  can place a checkmark there.
18  Q. What about the fifth element, Doctor? What did you
19  learn about the fifth element of Claim 1?
20  A. Well, sir, what the fifth element says is: Generating a
21  supplemental strobe duration based on the average
22  preparatory image luminance and luminance weightings.
23      So, again, it's the supplemental strobe. That's the
24  main strobe. That's the strobe -- the flash that goes off
25  for the picture you actually wanted. And how it's coming up

27 (Pages 105 to 108)

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IMPERIUM IP HOLDINGS (CAYMAN) :   DOCKET NO. 4:14CV371
                                 :
VS.                              :   SHERMAN, TEXAS
                                 :   FEBRUARY 2, 2016
SAMSUNG ELECTRONICS CO.        :   AFTERNOON SESSION

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE AMOS L. MAZZANT,
UNITED STATES DISTRICT JUDGE, AND A JURY

APPEARANCES:

FOR THE PLAINTIFF:      MR. ALAN MICHAEL FISCH
                        MR. ROY WILLIAM SIGLER
                        MR. JEFFREY SALTMAN
                        MR. JOHN T. BATTAGLIA
                        FISCH SIGLER
                        5301 WISCONSIN AVENUE NW
                        FOURTH FLOOR
                        WASHINGTON, DC  20015
                        MR. DAVID MICHAEL SAUNDERS
                        MR. S. DESMOND JUI
                        MR. SRULI YELLIN
                        FISCH SIGLER
                        96 N. THIRD STREET, SUITE 260
                        SAN JOSE, CA  95112

                        MS. SILVIA JORDAN
                        FISCH SIGLER
                        505 EIGHTH AVE, 12TH FLOOR
                        NEW YORK, NY  10018

FOR THE DEFENDANT:      MR. JESSE J. JENNER
                        MR. CHRISTOPHER JOHN HARNETT
                        MR. STEVEN PEPE
                        MR. KEVIN JOHN POST
                        MR. ALEXANDER ERNEST MIDDLETON
                        ROPES & GRAY
                        1211 AVENUE OF THE AMERICAS
                        NEW YORK, NY  10036

**Page 2**

                        MR. SAMUEL LAWRENCE BRENNER
                        MR. SCOTT STEPHEN TAYLOR
                        ROPES & GRAY
                        PRUDENTIAL TOWER
                        800 BOYLSTON STREET
                        BOSTON, MA  02199

                        MS. REBECCA R. CARRIZOSA
                        ROPES & GRAY
                        1900 UNIVERSITY AVE 6TH FLOOR
                        EAST PALO ALTO, CA  94303
                        MR. CLYDE MOODY SIEBMAN
                        MR. LARRY PHILLIPS
                        SIEBMAN BURG PHILLIPS & SMITH
                        300 N. TRAVIS
                        SHERMAN, TX  75090

COURT REPORTER:      MS. JUDITH WERLINGER
                     DEPUTY OFFICIAL REPORTER
                     101 E. PECAN #110
                     SHERMAN, TEXAS  75090

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

**Page 3**

1     (Jury out.)
2     COURT SECURITY OFFICER:  All rise.
3     THE COURT:  Go ahead and bring the jury in.
4     COURT SECURITY OFFICER:  All rise for the jury.
5     (Jury in.)
6     THE COURT:  Please be seated.
7     Mr. Fisch, you may continue.
8     MR. FISCH:  Thank you, Your Honor.
9     DIRECT EXAMINATION CONTINUED
10    BY MR. FISCH:
11    Q.  Good afternoon, Dr. Wright.
12    A.  Good afternoon, sir.
13    Q.  Could you pick up where we left off, which was the
14    beginning of your analysis of Algorithm 2 for preflash?
15    A.  Yes, sir.  We had just finished Claim 1, going through
16    Algorithm 1, so now to go through Claim 1 with Algorithm 2,
17    I'm looking here at a document called Flash aE Algorithm by
18    Hae Sun Lee.  As I look into this document, we're going to
19    go through each element of Claim 1.
20    And the representative device for this I have chosen to
21    be the Galaxy Note2.  Once again, the -- all of the products
22    that use Algorithm 2 do it in the same way.  I could have
23    chosen any of them.  They all basically infringe the same
24    way.  So this is just, again, an example document -- an
25    example product.

**Page 4**

1     So for the Galaxy Note2, I would like to look at Claim
2     1.  And, once again, this is exactly the same claim language
3     that is from the patent that you have in your folders.  And
4     the first element of Claim 1 is a method of adjusting image
5     lighting, and so I look into the documentation for this
6     particular product.
7     You can see it has a flash.  It has a flash, so it has
8     a method of adjusting image lighting.  So I can then place a
9     checkmark in that box.
10    Q.  What about the second element, Doctor?
11    A.  Sir, the second element of generating that preparatory
12    light at a preflash, so I can go to the documentation for
13    the algorithm, the flash aE algorithm.  And you can see
14    here, I've blown up a place here and see there at the bottom
15    where it's generating the preflash.  So it is generating a
16    preflash for a preparatory duration.
17    And the duration here is a little bit different because
18    if you notice the dark black line up on top, that's actually
19    the preflash light is staying on.  But the -- how long the
20    sensor gets light from the flash is determined by that
21    little -- the little graph that you see below, the little
22    square-topped graph.  Each one of those represents an image
23    that is captured using the preflash.  And the amount of time
24    that it took to capture that preflash is predefined.  That's
25    a predefined duration.

Page 5

1   If the camera didn't know ahead of time what that
2   predefined duration was, it would have no way of making any
3   sense of the information it was going to get back from the
4   preflash.  So even though it leaves it on for more than one
5   of those preparatory images, it's still on for a predefined
6   duration.
7   Q.  Doctor, how do you know it's predefined?
8   A.  Because each of those is the -- is the time that's set
9   ahead of time because you have to know, again, the amount of
10  power and the amount of time to know how much light you have
11  emitted.
12      If you don't know those two things, then you can't make
13  any sense out of -- out of it.  You wouldn't even bother
14  using a pre -- preflash if you were --
15  Q.  So that's the predetermination?
16  A.  Yes, sir, you have to know that ahead of time.
17  Q.  What does that teach?
18  A.  Well, sir, that tells me that Element No. 2 is met, and
19  I can place a checkmark in that box.
20  Q.  What have you learned about Element 3, Doctor?
21  A.  Well, Element 3 is the -- is the element describing how
22  to capture -- to capture the preparatory image while
23  generating that preparatory light.  And here again, from aE
24  flash, the -- the document, you can see where it talks about
25  preflash aE data acquisition.  And data acquisition is -- is

Page 6

1   acquiring that -- that image.  So it's getting that -- that
2   pre-image using the preflash.
3   Q.  And what does that teach, Doctor?
4   A.  Well, sir, that tells me that this element is also met,
5   and I can place a checkmark in this box.
6   Q.  What did you learn about the next element, Element 4,
7   Doctor?
8   A.  Well, sir, that next element talks about using the
9   average preparatory image luminance of the preparatory image
10  based upon preparatory image data and waiting at least a
11  subset of it to -- of the preparatory image data.
12      So, again, I go into the documentation and can see here
13  from the documentation of that algorithm where they're --
14  where they're using the average brightness.  So it's the
15  average -- the average luminance.
16      Of course, average comes from weighting.  And so I
17  can -- I can see from this, and I go to the auto-exposure
18  guide because that weighting talked about an AE, so I go to
19  the -- so I go to the AE document, which is the
20  auto-exposure document.  And here they're talking about how
21  they're using the different weightings to -- to gather the
22  information from that image.  And this is one of the
23  weighting modes.
24  Q.  And what does all that teach you then, Doctor?
25  A.  That tells me that this element of the claim is met, and

Page 7

1   I can place a checkmark in this box.
2   Q.  The next element, Doctor, what have you learned?
3   A.  So the next element is generating a supplemental strobe
4   duration based on the average preparatory image luminance
5   and luminance weightings.  So basically it's saying the
6   information that I just gathered from that preparatory
7   image, that pre-image that I took with a preflash, I'm going
8   to use that information to decide how much main flash I
9   need.  That's what the supplemental strobe is.
10      So, again, I -- I turn to the documentation, and you
11  can see here where it's calculating how much it needs for
12  main flash based on these parameters that it gathered during
13  the preflash.
14  Q.  And that teaches you what then, Doctor?
15  A.  Well, sir, this element is also met, and I place a
16  checkmark in this box.
17  Q.  The final element, Doctor, what have you learned?
18  A.  Sir, this -- this is the element that talks about
19  generating a look-up table.  And if you recall, the look-up
20  table was necessary to understand the workings of the -- the
21  flash unit in the camera.  Every -- every one is a little
22  bit different, and if the camera doesn't understand about
23  the characteristics of the flash unit, how much duration and
24  how much brightness will result in how much light being sent
25  out there to the scene, if you don't have that information,

Page 8

1   then it can't make sense out of things.
2      So when I look into the documentation, I see again that
3   it's using this -- this algorithm to do the flash, and I can
4   see from -- that this is actually source code that runs on
5   that particular device.
6      You can see that they reference a flash target table,
7   and a flash target table determines the value that then
8   points into the table that's -- that's been generated in
9   memory that will tell it what duration and par values are
10  appropriate for the flash.
11      Here, talking about the fact that -- if you read here
12  in the line I've blown up here, the one at the top, they are
13  concerned with the fact that this LED strobe does not behave
14  in a perfect manner.  It says right here that it's not
15  perfectly proportional to the current, and so the actual
16  performance of the LED light is not exactly perfect, so they
17  do have to characterize it and let the camera know what that
18  characterization is through this look-up table.
19      And it's again indicated by the wording down here.  You
20  see underlined flash exposure chart.  Again, this is a chart
21  of durations and powers.  It has to store the memory so that
22  it knows something about the flash that it's going to use.
23  Q.  What does all that teach you, Doctor?
24  A.  That tells me that this element of the claim is also
25  met, and I can place a checkmark in this box, sir.

2  (Pages 5 to 8)

A890

Page 13

1   A.  With respect to this claim, my conclusion is that
2   Samsung infringes the preflash patent.
3   Q.  But your research, your findings indicated that it is
4   more than just Claim 1 that was infringed in this patent, is
5   that correct, Doctor?
6   A.  Yes, sir.  Yes, sir.  I would like to turn next to Claim
7   6.
8        So Claim 6 discusses the method of Claim 1, further
9   comprising accessing the look-up table based on the average
10  image luminance.
11       And I also have to go through each of the three
12  algorithms for us.  So for the first algorithm, this is the
13  Strobo algorithm.  I look into this document, and I can see
14  that it's using these weighted averages and it's using that
15  to figure out what it needs for the main duration or the
16  main flash and so that it -- this confirms that it really is
17  using that table that it has stored and that is -- that is
18  what this claim says.
19       So I can place a checkmark in this box for Algorithm 1.
20  Q.  Because there's just one element of Claim 6, your
21  conclusion with respect to Claim 6 now is what, Doctor?
22  A.  Yes, sir.  Now I have to look at Claim 6 again for
23  Algorithm 2.  So Algorithm 2, again, is the Flash aE
24  algorithm, and here they're talking about using that average
25  brightness -- so there's the average image luminance --

Page 14

1   accessing the lookup table -- that comes from this -- this
2   calculation that they're doing, which is going to point them
3   into where the proper values are in the lookup table.
4        And you can even see just a little bit outside of the
5   red circle, just below it to the right, you can see they're
6   talking about basing it on the flash exposure chart.  So
7   there's that chart again.  That's that table that they have
8   to have stored.
9        And so based upon this, I know that this element is
10  met, and I can place a checkmark in that box.
11  Q.  That leaves Algorithm 3 with respect to Claim 6, Doctor.
12  What have you found?
13  A.  Yes, sir.  Once again, Algorithm 3 is the flash
14  algorithm, the newest of the three.  And when I look into
15  this, I can look further in the document, and you can see
16  where it's calculating this MainGV or the brightness that it
17  needs for the main flash.
18       And it's obtained from using this TargetG in the
19  preflash calculated, and it's using all of this data to then
20  find out what value is correct in that look-up table.  So
21  it's -- it's accessing the look-up table using this average
22  image luminance.
23       So that allows me to place a checkmark in this box.
24  Q.  So what is your ultimate conclusion regarding Claim 6,
25  Doctor?

Page 15

1   A.  Sir, Claim 6 is infringed by Samsung on the preflash
2   patent.
3   Q.  Now, your research indicated that there was an
4   additional claim.  Which claim was it, Doctor?
5   A.  Yes, sir.  And turn to Claim 7.  Now, Claim 7 will be a
6   little faster, because Claim 7, if you look at it, you'll
7   find that the wording is almost the same as Claim 1 except
8   for the additional phrase "machine-readable instructions."
9   You'll see that sort of in front of each one.
10       So basically what that's saying is machine-readable
11  instructions in this context is just a computer program,
12  okay?  So it's saying that there's some computer program
13  that runs -- that does these things.
14       And since I already showed that each one of these
15  elements from Claim 1 is performed, and I know how the
16  camera has to operate, that it's running on a little
17  computer inside the camera, then each of these elements then
18  have to be met, and I can place checkmarks in these boxes.
19  There's no other way for the camera to work.
20  Q.  And, Doctor, you've now walked us through Claim 1, Claim
21  6, and Claim 7, the three claims you found to be infringing.
22  What is your ultimate conclusion regarding the preflash
23  patent?
24  A.  Sir, I conclude that Samsung infringes the preflash
25  patent.

Page 16

1   Q.  And that was on the representative products you began
2   with.  I know you've looked at other phones and certainly
3   other cameras.  So could you walk us through your thinking
4   on that as well, please?
5   A.  Well, for all phones, this is a list of the categories
6   of documents that I looked at to come to these conclusions.
7   Certainly Samsung's own answers to Imperium's questions, all
8   the different guides and manuals, all of the exposure guide
9   libraries, modules, source code for the devices, even the
10  deposition of Hae Sun Lee on how this works, and that's what
11  led me to the conclusion on each of those models of the
12  phones.
13       And so I concluded that these 15 models of phones are
14  infringing the preflash patent.
15  Q.  And what about the cameras, Doctor?
16  A.  For the cameras, again, lots of documentation, most of
17  it by Samsung, their own responses to the interrogatory, all
18  the user guides and manuals, different source code, other
19  documents, the deposition of Jaehun Lim.
20       All this together drew me to the conclusion that those
21  52 models of cameras actually are infringing the preflash
22  patent, and these are the 52 models.
23  Q.  Doctor, thank you for walking us through the preflash
24  patent.  That leaves just one patent left.
25  A.  Yes, sir.

4 (Pages 13 to 16)

# EXHIBITS 31-32 Redacted in Their Entirety